Mark R. WENZEL, Appellant–
Respondent and Third–Party
Plaintiff below,

v.

HOPPER & GALLIHER, P.C., formerly known As Hopper, Wenzel & Galliher, P.C., George W. Hopper and Mark R. Galliher, P.C., et. al., Appellees–Petitioner and Third–Party Defendants below.

No. 49A02–0105–CV–274.

Court of Appeals of Indiana.

Nov. 22, 2002.

31

Kevin P. McGoff, Indianapolis, IN, Attorney for Appellant.

Deborah J. Caruso, Indianapolis, IN, J. Lee McNeely, Shelbyville, IN, Attorneys for Appellees.

## OPINION

HOFFMAN, Senior Judge.

Appellant/Respondent Mark R. Wenzel ("Wenzel") appeals the trial court's judgment as it applies to a suit filed by Hopper & Galliher, P.C. ("H&G"), formerly known as Hopper, Wenzel, & Galliher, P.C. We affirm in part and reverse in part.

Wenzel raises six issues with subparts for our review. In order to facilitate an orderly review of the issues raised, we state a number of these subparts as separate issues. Thus, we state the issues as:

I.  Whether the trial court erred when it concluded that the value of Wenzel's shares should be reduced by the value of certain liabilities.

II.  Whether the trial court erred when it concluded that the value of Wenzel's shares should be reduced through application of minority and marketability discounts.

III.  Whether the trial court erred when it determined that certain contingency fee cases were not H&G assets on the valuation date of Wenzel's shares.

IV.  Whether the trial court erred in characterizing the payment of Wenzel's share of certain contingency fee cases as compensation.

V.  Whether the trial court erred when it refused to admit evidence of fees earned by H&G in a particular bankruptcy matter.

VI.  Whether the trial court erred in refusing Wenzel's request for attorney fees and expenses under Ind.Code § 23–1.5–3–3(f).

VII.  Whether the trial court erred in refusing Wenzel's request for a share of H&G's profits after Wenzel's departure.

VIII.  Whether the trial court erred in denying Wenzel's request for pre-judgment interest.

IX.  Whether the trial court's findings of fact and conclusions of law pertaining to Wenzel's breach of fiduciary duty and "freeze out" claims are supported by the facts and law.

X.  Whether the trial court's findings of fact and conclusions of

law pertaining to H&G's breach of fiduciary duty claim are supported by the facts and law.

The facts, as found by the trial court, are as follows. In the fall of 1990, Wenzel began talking to George Hopper ("Hopper") about working as an attorney at Hopper's unincorporated law firm. (Finding of Fact # 2; Appellant's App. at 48). After a series of meetings, it was agreed that Wenzel would join the firm at the beginning of January, 1991 as a salaried employee and that Hopper would incorporate and capitalize the firm as a professional corporation. (Finding of Fact # 3; Appellant's App. at 48). At the end of 1991, an agreement was entered into whereby Wenzel and Mark Galliher ("Galliher") would each purchase one third of H&G's stock from Hopper. (Finding of Fact # 4; Appellant's App. at 48–49). Under the compensation plan, the net revenues were to be distributed in relation to each shareholder's contribution to the firm. (Finding of Fact # 5; Appellant's App. at 49).

In the spring of 1994, Wenzel began stating to Galliher that Hopper was not being forthright in his provision of information to Wenzel about H&G's income. Wenzel further stated that he did not like working with Hopper. (Finding of Fact # 7; Appellant's App. at 50). In September of 1994, Hopper and Galliher completed a trial in which a large settlement was won for H&G's client. Wenzel expressed his belief that he was entitled to one third of the contingency fee from the aforementioned case and that he feared he would be deprived of the share. (Finding of Fact # 8; Appellant's App. at 50). Discussions began pertaining to a specific formula for determining respective compensation, but Wenzel expressed disapproval of a subsequent proposed formula. (Finding of Fact # 9; Appellant's App. at 50–51).

On March 27, 1995, Hopper, Galliher, and Wenzel met for H&G's annual shareholder meeting. The meeting ended with a discussion of the shareholders' inability to resolve the issue of compensation raised by Wenzel, and Wenzel agreed that he would seek employment elsewhere. (Finding of Fact # 10; Appellant's App. at 51). After the meeting, Wenzel continued to work for H&G's clients and to receive his full salary while he looked for another position. (Finding of Fact # 11; Appellant's App. at 51). Wenzel ended his employment with H&G on June 30, 1995. (Finding of Fact # 12; Appellant's App. at 51–52).

■ The facts, as contained in the record but not specifically found by the trial court, are as follows. After Wenzel's departure, Hopper and Galliher attempted to negotiate with Wenzel to determine the amount due Wenzel as a withdrawing shareholder of H&G. As part of these negotiations, Wenzel requested to be paid approximately $400,000.00 for his stock and a share of H&G's contingency fees. In response, H&G offered to purchase Wenzel's stock at the amount he paid for it (approximately $27,000.00) and to pay Wenzel a portion of H&G's contingency fees. In response to H&G's offer, Wenzel demanded that H&G file a petition to value Wenzel's shares pursuant to the Indiana Professional Corporations Act (the "Act").[1]

---

1. The Act is found at Ind.Code § 23–1.5–1–1 et seq. Ind.Code § 23–1.5–3–3 provides that a shareholder of a professional corporation who becomes a "disqualified person" may make a written demand within sixty days after the date of the corporation's written offer that the corporation file a petition requesting that the fair value of shares be determined. A "qualified person" under the Act is an individual "that is eligible under this article to own shares issued by a professional corporation." Ind.Code § 23–1.5–1–12. A "disquali-

H&G then commenced an action requesting the trial court to determine the fair value of Wenzel's shares. In response, Wenzel asserted claims against H&G, and against Hopper and Galliher individually, for breach of fiduciary duty and "freeze out." H&G subsequently asserted a breach of fiduciary duty claim against Wenzel seeking damages caused by Wenzel's alleged improper pre-departure solicitation of H&G clients.

After a bench trial, the trial court determined the value of Wenzel's stock, denied Wenzel's breach of fiduciary duty claim, and granted H&G's breach of fiduciary duty claim. The trial court's judgment included findings of fact and conclusions of law. Wenzel now appeals.

### STANDARD OF REVIEW

■ When a party has requested specific findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998). In reviewing the judgment, we first must determine whether the evidence supports the findings and second, whether the findings support the judgment. *Ahuja v. Lynco Ltd. Medical Research,* 675 N.E.2d 704, 707 (Ind.Ct.App.1996), *trans. denied.* The judgment will be reversed if it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any

evidence or reasonable inferences from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.* A judgment is clearly erroneous even though there is evidence to support it if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Owensby v. Lepper,* 666 N.E.2d 1251, 1256 (Ind.Ct.App. 1996).

### I.

■ At trial, H&G's expert testified that the appropriate method to determine the "fair value" of Wenzel's shares was the "net asset" approach, netting H&G's assets as of June 30, 1995 (including all accounts receivable and unbilled work in progress through that date) against H&G's liabilities on that date. Although Wenzel's expert agreed with applying a "net asset" approach, he disputed several elements of the valuation suggested by H&G's experts and adopted by the trial court. The trial court found that the value of H&G's assets should be reduced by liabilities for H&G's sublease and telephone service contract. Wenzel contends that in doing so the trial court improperly forced him to share in the projected liabilities of H&G's future

---

fied person" is an individual "that for any reason is or becomes ineligible under this article to own shares issued by a professional corporation." Ind.Code § 23–1.5–1–6. As an attorney "in good standing admitted to the practice of law in Indiana," Wenzel was a "qualified person" at the time he acquired shares in H&G. *See* Ind.Code § 23–1.5–1–4. Because he remained in good standing admitted to practice law in Indiana at the time he left H&G, he was still technically eligible as a "qualified person" to hold shares in H&G under the article. *See* Galanti, 20 Indiana

Practice § 52.10 (1991 ed.). He is a "disqualified person," however, under Indiana Admission and Discipline Rule 27(c), which requires that a shareholder in a professional corporation "shall be actively engaged in the practice of law through such professional corporation[.]" Thus, although Wenzel might not have the right to compel H&G to repurchase his shares under the Act as a "disqualified person," he is entitled to use the procedures set forth in the Act through "disqualification" under the admission and discipline rule. *See* Galanti, 20 Indiana Practice § 52.10, n. 10.

business. In support of this contention, Wenzel cites *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 245 (Ind.2001) for the proposition that a former shareholder may not share in a corporation's future "upside or downside."

The trial court found that H&G remained obligated to pay over $461,000.00 under the sublease agreement and that the lease payments were "significantly more than the [lease payments] payable for similar subleased space." After noting that one of H&G's experts had testified that the sublease represented a liability to H&G as of June 30, 1995, in the amount of $179,000.00, and another had testified that the telephone service contract was also a liability on that date, the trial court found that these two items were a liability to H&G as of June 30, 1995, in the combined amount of $188,497.86. (Finding of Fact # 14; Appellant's App. 52–53).

We cannot say that the trial court clearly erred in accepting expert testimony that the sublease and telephone service contract had a significant effect on the value of Wenzel's shares on June 30, 1995. Also, we cannot say that the trial court clearly erred in its quantification of that effect.

Furthermore, we do not believe that the trial court's valuation is improper as a matter of law under *G & N.* In *G & N,* the trial court determined that the majority shareholder in a closely-held corporation had committed significant wrongs in relation to the minority shareholder and that the appropriate remedy was, inter alia, the purchase of the minority shareholder's shares by the majority shareholder. Our supreme court held that this remedy was appropriate, but it disapproved of the trial court's award of dividends "until the fair value of [the minority shareholder's] shares is paid." 743 N.E.2d at 245. In so doing, the court held that "[a]s of the date of judgment [the minority shareholder] is properly viewed as a creditor of [the majority shareholder] entitled to post-judgment interest, but no longer sharing either the upside or downside of [the corporation's] profitability." *Id.* The issue of the propriety of payment of post-judgment damages based upon future profitability in *G & N* is not apposite with the issue of the propriety of including an offset for the current effect of long-range liabilities in determining the net asset value of Wenzel's shares in the present case. Accordingly, Wenzel's reliance on *G & N* is misplaced.

## II.

Wenzel contends that the trial court erred as a matter of law in lowering the value of his shares through the application of minority and marketability discounts. He argues that discounts based upon marketability are not relevant to the determination of the fair value of shares purchased by the corporation in a statutory "buy out."

The trial court found that "based on generally accepted principles" and the opinion of H&G's expert, the value of Wenzel's shares should be discounted by 15% upon Wenzel's minority status and 10% for "lack of marketability." (Finding of Fact # 15; Appellant's App. at 53). In making this finding, the trial court apparently relied on the expert's testimony that "lack of control" dictates the minority discount, and "lack of market" dictates the marketability discount. (Appellee's App. at 240). The trial court concluded that the application of these discounts was proper under *Perlman v. Permonite Manufacturing Co.,* 568 F.Supp. 222 (N.D.Ind.1983).

The Act does not define the term "fair value." The Act does, however, provide that the Indiana Business Corporation Law ("BCL") is applicable where it is not in conflict with the Act's provisions. Ind.

Code § 23–1.5–2–1. The BCL defines "fair value" with respect to its dissenter's rights provisions as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Ind.Code § 23–1–44–3. This definition, while instructive in the process of ascertaining the accrual date in a dissenter's rights action, is not helpful in deciding the issue before us. Furthermore, there is no Indiana case law that defines "fair value" in a context which applies in this case. Thus, we turn to case law from other jurisdictions for guidance.

As a general proposition, the term "fair value" is not the same as, or shorthand for, the term "fair market value." *See HMO–W Inc. v. SSM Health Care System,* 234 Wis.2d 707, 611 N.W.2d 250, 255 n. 5 (2000) (citing Joseph W. Anthony & Karlyn V. Boraas, *Betrayed, Belittled ... But Triumphant: Claims of Shareholders in Closely Held Corporations,* 22 Wm. Mitchell L.Rev. 1173, 1186 (1996)). " 'Fair value' carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value." *Id.* "Fair market value," on the other hand, represents "the amount for which property will sell upon negotiations in the open market between an owner willing to sell and a buyer willing but not obligated to buy." *Id.* (citing *Rosen v. City of Milwaukee,* 72 Wis.2d 653, 242 N.W.2d 681 (1976)).

■ The procedure set forth in Ind. Code § 23–1.5–3–3 does not contemplate a sale on the open market to a third party. Instead, the procedure requires that the corporation or majority shareholder will provide a ready-made market and will purchase the disqualified person's shares for fair value. Thus, the Act's requirement of payment of "fair value" is not the same as "fair market value," and H&G's reliance on *Perlman* and other fair market value cases is misplaced.

Minority and marketability discounts are open market concepts. A minority discount allows an appraiser to adjust for a lack of control over the corporation on the theory that minority shares of stock are not worth the same amount to a third party as the majority holdings due to lack of voting power. *Arnaud v. Stockgrowers State Bank of Ashland, Kansas,* 268 Kan. 163, 992 P.2d 216, 218 (1999). A marketability discount allows an appraiser to adjust for a lack of liquidity in the stock itself on the theory that there is a limited supply of purchasers of the stock. *Id.*

A substantial majority of the cases from other jurisdictions have rejected the application of minority and marketability discounts when determining the fair value of stock in cases where a majority shareholder or corporation purchases the stock.[2] *See e.g., Brown v. Allied Corrugated Box Co.,* 91 Cal.App.3d 477, 486, 154 Cal.Rptr. 170 (1979) (holding that minority discounts have "little validity" when the purchaser is someone who is already in control of the corporation); *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del.1989) (holding that the discounting of shares in a buy-out unfairly enriches the majority shareholders and injects speculative factors into the sale); *Richardson v. Palmer Broadcasting Co.,* 353 N.W.2d 374, 379 (Iowa 1984) (holding that application of a minority discount is "contrary to the spirit of 'fair value' determinations"); *Arnaud, id.* (holding that minority and marketability dis-

---

**2.** *See* Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair* *Value,* 47 Duke L.J. 613, 641–42 (1998) and *Arnaud, id.* for a list of the majority cases.

counts are not appropriate in valuing stock when the purchaser of the stock is either the majority shareholder or corporation itself and overruling *Moore v. New Ammest, Inc.*, 6 Kan.App.2d 461, 630 P.2d 167, the Kansas case cited as authority in *Perlman*). The position of the majority of jurisdictions is best summed up in the following quotation:

> Applying a discount is inappropriate when the shareholder is selling [his] shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interest of those already in control. Therefore, requiring the application of a minority discount when selling to an "insider" would result in a windfall to the transferee. This is particularly true since the transferring shareholder would expect that the shares would have the same value in her hands as in the hands of the transferee.

*Hansen v. 75 Ranch Co.*, 288 Mont. 310, 957 P.2d 32, 41 (1998).

■ We find the reasoning set forth in the majority cases persuasive. The intent of Ind.Code § 23–1.5–3–3 is to provide the disqualified shareholder with "fair value" for his shares. Discounting the value of minority shares when the buyer is H&G itself, and not a third party, results in a windfall to H&G and something less than fair value to Wenzel. Furthermore, discounting the value of Wenzel's shares for lack of a market ignores the fact that Ind.Code § 23–1.5–3–3 creates a ready-made market. As one commentator has observed:

> Once a buy-out remedy as an alternative to dissolution is in place, the position of the minority shareholder with regard to liquidity has changed dramatically ... Clearly legislatures and courts have provided liquidity where heretofore it either did not exist or existed on a more limited basis. If courts are to consider all relevant factors, as courts that apply liquidity discounts have opined, one very relevant factor is the existence of legislatively and judicially created exits from the corporation. It would be incongruous to discount the shares of the minority shareholder for lack of liquidity when valuation is being done in connection with a proceeding that creates liquidity.

Charles W. Murdock, *The Evolution of Effective Remedies For and Valuation Of Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 Notre Dame Law Review 425, 486 (1990).

■ We decide this issue as a question of law. However, we recognize that there may be "extraordinary circumstances" which may make this issue a mixed question of law and fact. *See* American Law Institute, *Principles of Corporate Governance*, § 7.22 "Standards for Determining Fair Value," pp. 314–15 (stating that the "fair value" should be the value of the holder's proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability). As we noted above, H&G's expert opined that the discounts were appropriate for "lack of control" and "lack of market," concepts that have been rejected by the majority of courts that have written on this issue. The expert did not relate any extraordinary circumstances that would require a determination "on the facts." Accordingly, we hold as a matter of law that the trial

court erred in applying minority and marketability discounts in valuing Wenzel's stock.

██ H&G contends that Wenzel waived this issue when he did not object to testimony presented by H&G's expert. H&G's contention, however, is based upon H&G's erroneous assumption that this is a fact issue. As noted above, this is a matter of law. Therefore, H&G is wrong, and Wenzel has not waived this issue.

### III.

██ Wenzel contends that the trial court erred as a matter of law in treating contingent fee cases as a matter of compensation to be paid according to an agreement between H&G's shareholders rather than as assets to be paid according to each shareholder's holdings. In noting that the contingency fee cases should be treated as compensation, and not as part of the assets of the firm for purposes of determining the value of Wenzel's stock, H&G's expert testified that in order to be considered as H&G assets, the contingency fee cases must have (1) progressed to the point where demand for payment of the fee was appropriate because all of the necessary services had been provided, and (2) progressed to the point where the amount of the fee was ascertainable. The expert further testified that these criteria were not met in the present case. The trial court's findings of fact and conclusions of law reflect its adoption of the expert's testimony. We have found no authority which informs us that H&G's expert was wrong as a matter of law. We cannot say that the trial court erred in adopting the expert's opinion and finding that the contingency fees should be treated separately from the valuation of Wenzel's stock.

Wenzel cites *Kelly v. Smith,* 611 N.E.2d 118, 121 (Ind.1993) and other cases for the proposition that, as a matter of law, contingency fee cases should be included as part of the redemption value of shares. In these cases, the issue of whether the contingency cases constituted assets of the former entity was not before the courts. In other words, the classification of the contingency cases as assets was presumed. Given the expert testimony in this case, we conclude that the cited cases do not mandate the result argued by Wenzel.[3]

### IV.

██ As discussed above, the trial court accepted the testimony of H&G's expert that certain contingency fees did not constitute assets on June 30, 1995. However, the trial court did accept the contention of both parties that a portion of these fees was owed to Wenzel. The trial court awarded a portion of the fees in two contingency cases to Wenzel. In so doing, the trial court accepted the testimony of H&G's expert that the distribution of contingency fees to Wenzel should be taxed not as a distribution in redemption of Wenzel's stock, but as compensation. The trial court concluded that such compensation "shall constitute ordinary income to Wenzel for income tax purposes." (Conclusion of Law # 6; Appellant's App. at 59–60).

Wenzel contends that the trial court should have considered the fees as redemption proceeds and should have classified them as capital gains. In support of his contention, Wenzel cites *Steffen v. Commissioner,* 69 T.C. 1049, 1978 WL 3394 (1978).

In *Steffen,* four doctors incorporated as a professional service corporation under

---

3. We can foresee certain situations where cases with contingency fees could be considered part of the assets; however, under the facts and circumstances as found by the trial court, this is not such a situation.

the laws of the Commonwealth of Kentucky. On or near the date of incorporation, each of the doctors also executed an employment agreement with the corporation. Also on the same date, the doctors entered into a corporate redemption agreement that required the corporation to purchase and the doctor/shareholders to sell or offer to sell their shares to the corporation in the event of the doctor/shareholder's exit from the corporation. 69 T.C. at 1050.

Steffen, one of the doctor/shareholders, left the employment of the corporation, and he offered his stock to the corporation at that time. The corporation paid Steffen $40,000.00 upon surrender of his stock. Steffen subsequently reported a long-term capital gain from the redemption of the stock. The corporation, however, treated $1,000.00 of the $40,000.00 cash payment as having been paid to Steffen in redemption of his stock and deducted $39,000.00 as salary expense. The corporation based its treatment on its belief that the bulk of the amount paid to Steffen was attributable to accounts receivable of the corporation.

The tax court held that the parties' agreement dictated the tax treatment to be given to the cash payment. The tax court emphasized that the corporation did not argue that Steffen was paid the $39,000.00 pursuant to his employment contract, but "simply that it considered the value of its accounts receivable in arriving at the amount it paid him." 69 T.C. at 1053. Under these circumstances, the accounts receivable were a corporate asset and Steffen's interest in them was as a corporate shareholder, "and then only as

that asset affected the value of his stock." *Id.*

In the present case, unlike in *Steffen,* there is no agreement and subsequent cash payment based upon the corporation's consideration of the value of contingency fees in arriving at the amount to be paid in redemption of stock. Here, the trial court found, for reasons stated in Issue IV above, that the contingency fees were not corporate assets on the June 30, 1995. In this manner, they differ from the accounts receivable in *Steffen* which were presumably due and ascertainable at the time Steffen left the corporation. Furthermore, the trial court in the present case found that there was an agreement which stated that the parties were paid a portion of the contingency fees as compensation. *Steffen* is not controlling, and the trial court did not err in determining that the compensation agreement applied and that the fees were income to Wenzel.[4]

## V.

Wenzel contends that the trial court erred in refusing to admit evidence tendered by Wenzel regarding work-in-progress related to a bankruptcy case captioned *E&S Facilities, Inc.* A trial court has broad discretion in determining the propriety of admission of evidence. *Columbian Rope Co. v. Todd,* 631 N.E.2d 941, 945 (Ind.Ct.App.1994). Reversal of the trial court's ruling is warranted only when the court has abused its discretion, and its action is clearly erroneous and against the facts and circumstances before it. *Id.*

4. In his reply brief, Wenzel challenges the trial court's ruling on contingency fees because the trial court erroneously considered the contingency fees to be "deferred compensation" as that term is used in Ind.Code § 23–1.5–3–3(j). This issue was not raised in Wenzel's original appellant's brief. An issue raised in a reply brief that was not advanced in the appellant's original brief is waived and will not be considered on appeal. *LeBrun v. Conner,* 702 N.E.2d 754, 758 n. 1 (Ind.Ct.App. 1998).

The evidence proffered by Wenzel consisted of a court order outlining fees that were earned by H&G in the E&S matter after June 30, 1995. Other evidence established that the parties had a compensation agreement whereby each member of the firm was to be paid according to his contributions to the case and that Wenzel made no contributions to the case after the aforementioned date. Under these circumstances, Wenzel was not entitled to any of the fees outlined in the proffered document. Thus, the evidence was not relevant to the issues before the trial court, and the trial court did not err in refusing to admit the evidence.

## VI.

At trial, Wenzel requested an award of costs (attorney fees) and expenses under Ind.Code § 23-1.5-3-3(f). This statute provides that the corporation shall be required to pay the costs and expenses of a valuation hearing under Ind. Code § 23-1.5-3-3(d). However, "[i]f the fair value of the shares as determined by the trial court does not exceed the amount specified in the last written offer made by the corporation, the trial court may assess all or any part of the costs and expenses of the proceeding against the disqualified person."

The trial court found that the fair value of Wenzel's shares was $48,265.62. (Finding of Fact # 17, Appellant's App. at 55). On Wenzel's claim for costs and expenses, the trial court concluded:

[T]he court finds that the fair value of Wenzel's shares is less than the amount offered to Wenzel by [H&G] in [H&G's] last written offer. In this regard, [H&G's] last written offer ... proposed to pay Wenzel $77,500 cash, in compensation for Wenzel's stock, and also proposed to pay compensation to Wenzel from contingency fees in amounts in excess of the amounts to which the Court has found Wenzel is entitled. [H&G's] previous written offer ... likewise proposed to pay Wenzel $77,500 for his stock. Wenzel failed to respond to either of [H&G's] last two written offers. The Court accordingly concludes that each party should pay its own attorney fees and costs, and that Wenzel is not entitled to recover any amount as attorney fees and costs of this action.

(Conclusion of Law # 10; Appellant's App. at 61-62).

In interpreting Ind.Code § 23-1.5-3-3(f), we place it in context by reviewing the subsections which precede it. Whenever a shareholder of a professional corporation becomes a disqualified person, and his shares are not transferred to another qualified person, the corporation is required to purchase or redeem the shares. Ind.Code § 23-1.5-3-3(a). If the price and method of payment for the disqualified person's shares are not fixed or ascertainable by the articles of incorporation or the bylaws of the corporation or by private agreement, the corporation shall make a *written offer* to pay the shares at a specified price determined to be the fair value on the date of disqualification. Ind.Code § 23-1.5-3-3(b). If the fair value of the shares is agreed upon between the disqualified person and the corporation within thirty days after the date of the *written offer* from the corporation, payment of the shares shall be made upon surrender of the certificate or certificates representing the shares. Ind. Code § 23-1.5-3-3(c). If the disqualified person and the corporation do not agree on the fair value within sixty days after the date of the corporation's *written offer*, the disqualified person may make a written demand that the corporation file a petition with the trial court requesting a determination of the shares' fair value or the corporation may elect to file a petition of

its own volition. Ind.Code § 23–1.5–3–3(d). The costs and expenses of this determination are at issue under Ind.Code § 23–1.5–3–3(f).

Wenzel contends that the term "last written offer" in Ind.Code § 23–1.5–3–3(f) refers to the last offer tendered prior to the filing of a petition for valuation under Ind.Code § 23–1.5–3–3(d). Stated differently, Wenzel contends that the term "last written offer" as used in subsection (f) refers back to the term "written offer" as used in preceding subsections. Wenzel argues that any other interpretation will allow the corporation to manipulate the valuation process. Wenzel notes that the only written pre-petition offer made by H&G was lower than the value found by the trial court. Wenzel asserts that the trial court erred both in interpreting "last written offer" to apply to a post-petition offer and in determining that the corporation was not required to pay all costs and expenses.

A trial court's interpretation of a statute is a legal question that is reviewed de novo. *Golden Rule Insurance Company v. McCarty*, 755 N.E.2d 1104, 1106 (Ind.Ct. App.2001), *trans. denied.* In interpreting a statute, it is our duty to give effect to the intention of the legislature. *Morgan County v. Ferguson*, 712 N.E.2d 1038, 1043 (Ind.Ct.App.1999). In determining the intention of a statute, "it is important to recognize what the statute does not say as well as what it does say." *Id.* We must not add or read into a statute any terms the legislature omitted, as we "cannot venture upon the dangerous path of judicial legislation to supply omissions or remedy defects in matters committed to a coordinate branch of government." *State ex rel. Roberts v. Graham*, 231 Ind. 680, 110

N.E.2d 855, 858 (1953). "It is far better to wait for necessary corrections by those authorized to make them, or . . . for them to remain unmade . . . than for judicial tribunals to transcend the just limits of their constitutional power." *Id.*

In the context of the various subsections of Ind.Code § 23–1.5–3–3, the terms "written offer" and "last written offer" do not appear to be synonymous. Although in some cases the "written offer" may be the only offer, and thus the "last written offer," the term "last written offer" appears to anticipate more than one offer. If the legislature wanted "last written offer" to refer only to "pre-petition" offers, it could have done so by using terms of limitation in subsection (f). The "pre-petition" limitation is not a part of the plain language of the statute, and its absence is significant. Furthermore, we reject Wenzel's contention that the trial court's interpretation allows a corporation to manipulate the process with impunity as the statute gives the trial court the discretion to require the corporation to pay costs and expenses if it determines that such a requirement is warranted.[5]

## VII.

Wenzel contends that H&G has attributed income to him for every year since 1995, that he has not received the income, and that he has had to report the income on his tax returns. He argues that we should order H&G to pay him "cash in the amount of the income allocated to him [by H&G] for every year since 1995." Appellant's Brief at 28.

In response, H&G alleges that this request to be reimbursed for "attributed" income was not articulated in Wenzel's

---

5. We note that the elimination of the minority and marketability discounts on remand may result in a valuation that is more than the last written offer. If that proves to be true, the trial court should order the corporation to pay costs and expenses of valuation under Ind.Code § 23–1.5–3–3(f).

pleadings, in Wenzel's trial brief, in the proposed Findings of Fact and Conclusions of law submitted by Wenzel before and after the valuation proceeding, or in the testimony presented by Wenzel. H&G further alleges that Wenzel failed to supply the trial court with any evidence as to the amount of the attributed profits. Appellee's Brief at 38. In his reply brief, Wenzel does not contest H&G's response, other than to show some testimony regarding the attribution of income.

Our review of the hearing transcript discloses some testimony on "attributed" income in 1996 (in the amount of $7,000 to $9,000). This testimony, sandwiched between Wenzel's testimony pertaining to his claims for attorney fees and testimony pertaining to damages for breach of fiduciary duty and "freeze-out," is very brief. Our review further discloses that Wenzel's pleadings, forty-page trial brief, twenty-two page supplemental trial brief, and preliminary proposed findings did not make any reference or request pertaining to this attributed income. Furthermore, although Wenzel's post-hearing proposed findings include a proposed finding that $8,172.00 of income had been wrongly attributed to him, there is no corresponding proposed conclusion of law or portion of the proposed judgment that addresses the issue. Wenzel may not ask this court to grant relief he failed to request from the trial court. *Nelson v. Marchand,* 691 N.E.2d 1264, 1269 (Ind.Ct.App.1998). Accordingly, he has waived this issue.

## VIII.

■ Wenzel contends that the trial court erred in determining that Wenzel was not entitled to an allowance for pre-judgment interest on the amount of all assets other than work in progress arising after June 30, 1995. Wenzel cites Ind. Code § 23–1.5–3–3(e), which states:

In a proceeding under subsection (d) [a valuation proceeding], the disqualified person is entitled to judgment against the corporation for the amount of the fair value of his shares as of the date of death, disqualification, or transfer, upon surrender to the corporation of the certificate or certificates representing the shares. The court may order that the judgment be paid by the corporation in such installments as the court determines to be fair and just. The judgment may include an allowance for interest, not to exceed the legal rate of interest for judgments specified in IC 24–4.6–1–101, from the date of death, disqualification, or transfer.

The trial court concluded that Wenzel was not entitled to recover pre-judgment interest because the amount of the fair value of Wenzel's shares had not been liquidated. The trial court also concluded that Wenzel was not entitled to recover pre-judgment interest because "Wenzel has been at least as responsible as [H&G] for the length of this litigation, and the delay in determining the value of Wenzel's shares." (Conclusion of Law # 11; Appellant's App. at 62).

■ An award of pre-judgment interest is founded on the theory that there has been a deprivation of the plaintiff's use of money or its equivalent and that unless interest is added, the plaintiff cannot be fully compensated. *Crawford County Community School Corp. v. Enlow,* 734 N.E.2d 685, 692 (Ind.Ct.App.2000), *trans. denied.* An award of pre-judgment interest is generally not considered a matter of discretion. *Id.* Ind.Code § 23–1.5–3–3(e) differs from the common law, however, in that it grants the trial court discretion to determine whether such an award is appropriate. We review the trial court's determination to ascertain if it abused its discretion. An abuse of discretion occurs

only when the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Associates,* 758 N.E.2d 931, 941 (Ind.Ct.App.2001).

Here, the evidence indicates that the delay in determining the fair value of Wenzel's stocks was occasioned at least in part by Wenzel's unreasonable demand of $400,000.00 for stock worth far less and by Wenzel's failure to respond to two written offers from H&G. Thus, the deprivation of Wenzel's use of money for his shares was caused, in significant part, by his own actions. Under these facts and circumstances, the trial court did not abuse its discretion in denying Wenzel's request for an award of pre-judgment interest.

## IX.

After H&G filed its valuation petition, Wenzel filed a third party complaint for damages arising from Hopper and Galliher's alleged breach of fiduciary duty and from forcing Wenzel out of the firm ("freeze out"). The trial court found that there was "no substantial, credible evidence that Hopper and Galliher, at any time, schemed to force Wenzel out of [H&G], or used any threats, coercion, or pressure to cause Wenzel to resign as an employee of the firm." (Finding of Fact # 22; Appellant's App. at 56–57). The trial court also found that "the evidence proves that Wenzel disliked working with Hopper, and agreed to leave [H&G], on March 27, 1995, after deciding he was no longer willing to abide by the parties' agreement as to compensation, which the parties had followed since Wenzel's initial

employment in 1991." *Id.* The trial court further found that "Wenzel has not presented substantial, credible or probative evidence that Hopper or Galliher limited Wenzel's contacts with [H&G's] clients, denied Wenzel access to [H&G's] financial records, limited [H&G's] associates or other employees from working for Wenzel, or were in any way unfair or dishonest to Wenzel." (Finding of Fact # 23; Appellant's App. at 57). The trial court concluded that Wenzel failed to sustain his burden of proving any of the claims asserted in his third party complaint. (Conclusion of Law # 12; Appellant's App. at 62).

Wenzel contends that the trial court erred in finding that Hopper and Galliher did not breach their fiduciary duty. Specifically, Wenzel contends that the trial court erred in not placing the burden of proof on Hopper and Galliher. In support of this contention, Wenzel cites case law which holds that "[o]nce it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud [and][t]he burden of proof shifts to the fiduciary to overcome the presumption by showing his actions were honest and in good faith." *W & W Equipment Co. v. Mink,* 568 N.E.2d 564, 573 (Ind.Ct.App. 1991), *trans. denied* (citing *Dotlich v. Dotlich,* 475 N.E.2d 331, 342 (Ind.Ct.App. 1985), *trans. denied but later abrogated on other grounds in State Board of Tax Commissioners v. Town of St. John,* 751 N.E.2d 657 (Ind.2001)).

Wenzel contends that Hopper and Galliher conspired together to force his departure from H&G and that they benefited from this "freeze out." [6] In support

---

6. A "freeze out" has been defined as "the use of corporate control vested in the statutory majority of shareholders or the board of directors to eliminate minority shareholders

from the enterprise or reduce their voting power or claims on corporate assets to relative insignificance." *Mink,* 568 N.E.2d at 574 (citing *Gabhart v. Gabhart,* 267 Ind. 370, 370

of his contention, Wenzel recites his trial testimony as to the ways that Hopper and Galliher benefited from his departure.

We agree with Wenzel that the trial court erred in concluding that the burden of proof was on Wenzel. His testimony was sufficient to create a presumption of fraud, and the burden of proof shifted to Hopper and Galliher. This error, however, is harmless. For every action that Wenzel testified about and characterized as breach of a fiduciary duty or illegal freeze out, Hopper and Galliher countered with their own testimony and characterization of the action as honest and done in good faith. Hopper's and Galliher's testimonies were sufficient both to overcome the presumption of fraud and to prove that they neither breached their fiduciary duties nor engaged in a "freeze out." Furthermore, as the sole trier of fact, the trial court credited Hopper's and Galliher's testimonies over the testimony of Wenzel. We will not reweigh the evidence or judge the credibility of the witnesses.

## X.

After filing its valuation petition, H&G filed a complaint for damages arising from Wenzel's breach of fiduciary duty. The trial court found that "between March 27 and June 30, 1995, Wenzel secretly contacted numerous clients of [H&G] for whom Wenzel was doing work, and solicited such clients to leave [H&G] and to employ Wenzel's new firm, after his departure." (Finding of Fact # 24; Appellant's App. at 57). The trial court also found that "[m]any of these clients solicited by Wenzel discontinued using [H&G's] services on June 29, 1995, the date when Wenzel finally disclosed his intent to leave [H&G's] premises by June 30, 1995, and

requested the immediate transfer of their files to Wenzel at [another law firm]." *Id.* The trial court further found that "[d]uring the three (3) months Wenzel was soliciting [H&G's] clients, from March 27, 1995, through June 30, 1995, Wenzel received more than $20,000.00 in gross salary, exclusive of benefits, based on Wenzel's annual [base] salary of $80,000.00." The trial court concluded that Wenzel "as a shareholder of [H&G], owed duties to [H&G], and that Wenzel breached his fiduciary duties to [H&G] by actively soliciting clients to leave [H&G], and to transfer their files to him at his new firm, all while he was still a paid employee of [H&G]." (Conclusion of Law # 13; Appellant's App. at 62–63). The trial court further concluded that H&G was entitled "to recover damages from Wenzel for breaches of his fiduciary duties, including the compensation received by Wenzel during the time he was soliciting H&G's clients, in the amount of $20,000.00." (Conclusion of Law # 14; Appellant's App. at 63).

As a shareholder, Wenzel owed a fiduciary duty both to his fellow shareholders and to H&G. *See Mink*, 568 N.E.2d at 570. In exercising his fiduciary duty, Wenzel was prohibited from acting "out of avarice, expediency or self-interest in derogation of [his] duty of loyalty to the other shareholders and to the corporation." *See Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995). Wenzel's fiduciary duty also includes the duty to abstain from pre-departure "surreptitious solicitation" of firm clients for personal gain. *See Graubard, Mollen, Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179, 1183 (1995). In determining whether Wenzel breached his fiduciary

N.E.2d 345 (1977)). A "freeze out" implies a purpose to force upon the minority shareholder a change which is not incident to any other corporate business goal. *Id.*

duty, the following comments by the court in *Graubard* are relevant:

> It is unquestionably difficult to draw hard lines defining lawyers' fiduciary duty to partners and their fiduciary duty to clients. That there may be an overlap, tension, even conflict between the two spheres is underscored by the spate of literature concerning the current revolving door law firm culture. (Citations omitted).
>
> One respected commentator opines that, while a departing partner's pre-resignation negotiations with firm clients in most businesses would probably constitute breach of the common-law obligation of loyalty to the firm, in the case of law practice, "the public policy favoring client freedom of choice in legal representation should override the firm's proprietary interest in holding its clientele." (Citation omitted).
>
> [A]s a matter of principle, pre-resignation surreptitious "solicitation" of firm clients for a partner's personal gain—the issue posed to us—is actionable. Such conduct exceeds what is necessary to protect the important value of client freedom of choice in legal representation, and thoroughly undermines another important value—the loyalty owed partners (including law partners), which distinguishes partnerships (including law partnerships) from bazaars.
>
> * * * * * * * * * * * * *
>
> As a matter of ethics, departing partners have been permitted to inform firm clients with whom they have a professional relationship about their impending withdrawal and new practice, and to remind the client of its freedom to retain counsel of its choice. Ideally, such approaches would take place only after notice to the firm of the partner's plans to leave. (Citations omitted).
>
> At the other end of the spectrum, secretly attempting to lure firm clients (even those the partner has brought into the firm and personally represented) to the new association, lying to clients about their rights with respect to the choice of counsel ... would not be consistent with a partner's fiduciary duties. (Citations omitted).

86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d at 1183–84.[7]

■ Our review of the trial transcript in the present case discloses that H&G chose not to put on direct evidence of Wenzel's alleged secret solicitation of seventeen of H&G's clients. Instead, H&G relied upon testimony and written evidence presented by Wenzel. Wenzel testified that on the penultimate day of his association with H&G he reviewed a proposed format with Hopper about how H&G's clients should be informed of his departure from H&G. Hopper, and later Galliher, approved the format, and Wenzel began calling the clients "for whom [he] had active matters" and told them he was leaving H&G. He also told them that "they had a choice that they could make—they could either leave the file with Hopper and Galliher or send that file with me if they chose to ... if they chose to have the file go with me, that they'd have to complete this [approved document] and send the original back to [Hopper]." Appellee's App. at 292.

---

**7.** H&G appears to advocate a rule that pre-departure solicitation is always a breach of fiduciary duty. In support of this argument, H&G cites *Dowd & Dowd v. Gleason*, 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358 (1998). We note that *Dowd* cites *Graubard* with approval, and it concludes that "proof of pre-termination solicitation of clients by the defendants *may* establish a breach of their fiduciary duties." *Id.*, 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d at 366 (emphasis supplied). *Dowd* does not establish the bright line rule advocated by H&G.

We are mindful of our standard of review here. As we stated above, we neither reweigh the evidence nor .reassign credibility. However, H&G completely failed to put on any evidence to show that the notification to these clients was improper. Furthermore, no inference of improper conduct can be drawn from Wenzel's testimony and documentary evidence. Therefore, to the extent that the trial court's findings on this issue refer to the seventeen clients who returned the approved document, they are erroneous.[8]

H&G did place into evidence a fax sent by Wenzel to National City Bank ("NCB"), one of H&G's major clients, in which Wenzel outlined the status of various files that he was working on for NCB. Included in this fax was a paragraph in which Wenzel stated, "As I indicated [in a previous conversation with the client], [my new firm] has agreed that I can continue to provide legal services to NCB at my current rates and under the same terms. Once you have had a chance to review this information, please feel free to call if you have any questions or comments." (Appellee's App.at 361). Even with Wenzel's testimony that this fax was simply a response to NCB's inquiries, the trial court could infer that the communication was a surreptitious attempt to solicit one of H&G's major clients. To the extent that the trial court's findings pertain to the secret solicitation of NCB, they are not clearly erroneous. As the court held in *Graubard*, such

secret solicitation is inconsistent with a shareholder's fiduciary duty.[9]

The trial court's determination that Wenzel should forfeit his entire salary of $20,000.00 is premised upon its finding that Wenzel was engaged in secret solicitation during the entire period from March 27, 1995 (the day he gave notice) and June 30, 1995 (the last day of his employment). Because the finding forming the premise for the amount of the damage award is clearly erroneous, we remand with instructions that the trial court determine what amount of damages is occasioned by Wenzel's surreptitious solicitation of NCB.

## CONCLUSION

The trial court did not err in crediting the expert testimony that the value of Wenzel's shares should be reduced by the value of the sublease and the telephone service contract. The trial court did not err in crediting expert testimony that the contingency fees were not assets on June 30, 1995, or in classifying the contingency fees as compensation. Also, the trial court did not err in refusing to admit evidence of fees earned by H&G after Wenzel's departure, refusing to order H&G to pay costs and expenses under Ind.Code § 23–1.5–3–3(f) (except to the extent that removal of minority and marketability discounts affects the amount of valuation), or refusing Wenzel's request for pre-judgment interest under Ind.Code § 23–1.5–3–3(e). In addition, the trial court did not err in finding that Hopper and Galliher did not

8. At numerous points in his brief, Wenzel has pointed out that the trial court adopted H&G's proposed findings of fact and conclusions of law as its own. We note that this practice may assist a trial court in moving its docket, and for this reason our supreme court has held that the practice is not prohibited. *See Prowell v. State*, 741 N.E.2d 704, 708 (Ind.2001). However, this practice is not encouraged as "there is an inevitable erosion of

the confidence of the appellate court that the findings reflect the considered judgment of the trial court." *Id.; A.F. v. Marion County Office of Family and Children*, 762 N.E.2d 1244, 1254 (Ind.Ct.App.2002), *trans. denied* (citing *Wrinkles v. State*, 749 N.E.2d 1179, 1188 (Ind.2001), *cert. denied*, 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002)).

9. We note that NCB chose to stay with H&G.

breach their fiduciary duty. Furthermore, Wenzel cannot prevail on his claim for "attributed income," as that claim has been waived.

To the extent that the trial court's findings of fact and conclusions of law pertain to Wenzel's breach of fiduciary duty by secretly soliciting NCB, the trial court's findings are proper. However, the trial court's findings of fact and conclusions of law are clearly erroneous to the extent they apply to the alleged secret solicitation of other clients. We remand with instructions that the trial court adjust its damage award to an amount consistent with this opinion.

Furthermore, we find that the trial court erred as a matter of law in reducing the value of Wenzel's shares through minority and marketability discounts. On remand, the trial court is instructed to re-calculate the value of the shares without these deductions. In the event that this re-calculation triggers the application of Ind.Code § 23–1.5–3–3(f), we instruct the trial court to order H&G to pay the costs and expenses of valuation.

Affirmed in part; reversed and remanded in part.

FRIEDLANDER, J., and MATHIAS, J., concur.