Sally McCARTY, Commissioner Department of Insurance Indiana Patient's Compensation Fund, Appellant,

v.

Frank WALSKO, Appellee.

No. 45A03–0605–CV–193.

Court of Appeals of Indiana.

Dec. 1, 2006.

440

Robert F. Parker, Chad J. Melchi, Burke Costanza & Cuppy, LLP, Merrillville, IN, Attorneys for Appellant.

Kevin W. Marshall, Law Office of Smith & Marshall, Hammond, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Sally McCarty, Commissioner of the Indiana Department of Insurance, as administrator of the Indiana Patient's Compensation Fund (the "Fund"), appeals the trial court's judgment in favor of Frank Walsko.[1]

We reverse.

### ISSUE

Whether Walsko satisfied the statutory prerequisites to seeking damages from the Fund.

### FACTS

On August 11, 1989, when Walsko was eleven years old, he was struck in the face with a rock. The rock shattered the lens of Walsko's prescription eyeglasses. The glass from the lens lacerated the cornea and sclera[2] of Walsko's right eye. On August 12, 1989, Walsko underwent surgery at Michael Reese Hospital in Chicago. The injury to Walsko's eye caused permanent scarring to the cornea and sclera. Walsko also suffered from eye strain, blurring and painful glare as a result from his injury. The nature of the injury also dictated that Walsko avoid certain activities which could exacerbate his injury.

On August 7, 1991, Walsko, by his parent and then-natural guardian, Diane Young, initiated a medical malpractice claim by filing with the Indiana Department of Insurance a proposed complaint against Drs. Ronald Fary and Robert Hoffman, the optometrists who provided Walsko's eyeglasses. On March 26, 1992, Walsko filed his complaint, alleging that Drs. Fary and Hoffman "fail[ed] to deliver eye glasses with shatter proof lenses" despite Young's request for shatterproof polycarbonate lenses instead of glass. (App. 14).

In November of 1996, Drs. Fary and Hoffman, along with their insurer, Meridian Mutual Insurance Company (collectively, the "Health–Care Providers"), and Walsko entered into a settlement agreement and release (the "Settlement Agreement"). The Settlement Agreement provided, in pertinent part, as follows:

Section 2.0: Payments

In consideration of the release set forth above, the Insurer on behalf of the Defendants agrees to pay to the individual named below ("Payee") the sums outlined in this Section 2 below:

2.1 Payments due at the time of settlement as follows:

The sum of $60,100.00 to be paid upon the execution of this Settlement Agreement by all of the signatories hereto.

---

1. We hereby deny the Fund's request for oral argument.

2. The sclera is the "dense fibrous opaque white outer coat enclosing the eyeball except the part covered by the cornea." Merriam–Webster Dictionary at *http://www.m-w.com/dictionary/sclera* (Oct. 16, 2006).

2.2 Periodic Payments made according to the schedule as follows (the "Periodic Payments"):

To be paid to Frank Walsko: $10,000.00 on August 17, 2005, $10,000.00 on August 17, 2010, $10,000.00 on August 17, 2015, $10,000.00 on August 17, 2020.

All sums set forth herein constitute damages on account of personal injuries and sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. Furthermore, the Defendants and Insurer represent to the Claimant that the present payment to the Claimant of $60,100.00 plus the cost of the Periodic Payments equals, and has a present value of, $75,100.00.

\* \* \*

Section 5.0: Consent to Qualified Assignment

5.1 The Claimant acknowledges and agrees that the Defendants and/or Insurer may make a "qualified assignment", within the meaning of Section 130(c) of the Internal Revenue Code of 1986, as amended, of the Defendants' and/or the Insurer's liability to make the Periodic Payments set forth in Section 2.2 to Providian Assignment Corporation (the "Assignee"). The Assignee's obligation for payment of the Periodic Payments shall be no greater than that of Defendants and/or the Insurer (whether by judgment or agreement) immediately preceding the assignment of the Periodic Payments obligation.

5.2 Any such assignment, if made, shall be accepted by the Claimant without right of rejection and shall completely release and discharge the Defendants and the Insurer from the Periodic Payments obligation assigned to the Assignee. The Claimant recognizes that, in the event of such an assignment, the Assignee shall be sole obligor with re-spect to the Periodic Payments obligation, and that all other releases with respect to the Periodic Payments obligation that pertain to the liability of the Defendants and the Insurer shall thereupon become final, irrevocable and absolute.

Section 6.0: Right to Purchase an Annuity

The Defendants and/or the Insurer, itself or through its Assignee, reserve the right to fund the liability to make the Periodic Payments through the purchase of an annuity policy from Commonwealth Life Insurance Company. The Defendants, the Insurer or the Assignee shall be the sole owner of the annuity policy and shall have all the rights of ownership.

(App. 32–34).

On July 9, 2003, Walsko filed a complaint against the Fund, seeking additional damages in the amount of $364,900.00. On September 3, 2003, the Fund filed its answer and affirmative defenses. As an affirmative defense, the Fund asserted that Walsko "has failed to satisfy all conditions precedent, specifically, the procedures outlined in I.C. 34–18–15–3, and I.C. 34–18–14–4." (App. 24).

The trial court conducted a bench trial on February 9, 2006. The Fund requested special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. On April 6, 2006, the trial court entered its findings of fact, conclusions of law and judgment. The trial court found the following:

1. This matter is properly before the Court pursuant to I.C. 34–18–5–3, and ... Plaintiff has met the statutory requirements for bringing the Complaint in this case.

2. In particular, Paragraph 1.2 of the Settlement Agreement specifically pro-

vides that Meridian Insurance is paying for employees as well as the Defendants, and in Paragraph 2.2 both Defendants and Insurer represent to the Claimant that the present payment to the Claimant of $60,100.00 plus the cost of periodic payments equals and has a present value of $75,100.00. With these statements by the defendants and the insurance company in the underlying case, the Court finds that the jurisdictional elements of the Medical Malpractice Act have been satisfied.

(App. 8–9). The trial court entered judgment in favor Walsko and against the Fund in the amount of $150,000.00.

## DECISION

■ The Fund asserts the evidence does not support the trial court's finding that Walsko satisfied the statutory elements required to access the Fund. When a party has requested special findings pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 36 (Ind.Ct.App.2002), *trans. denied.* In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.*

■ Whether a party is appealing a negative or adverse judgment determines the clearly erroneous standard that is to be applied. An adverse judgment is one entered against a party that did not bear the burden of proof but rather was defending on a given question. *Romine v. Gagle*, 782 N.E.2d 369, 376 (Ind.Ct.App.2003), *trans. denied.* In this case, the trial court entered findings in favor of Walsko, who had the burden of proof of showing he met the statutory prerequisites for admission into the Fund under Indiana Code section 34–18–15–3, which provides that a claimant may demand payment of damages from the Fund "[i]f a health care provider or its insurer has agreed to settle its liability on a claim by payment of its policy limits...." *See, e.g., Eakin v. Reed*, 567 N.E.2d 148, 149 (Ind.Ct.App.1991) (determining whether the Act's threshold requirements were met so that the Fund's assets were available), *trans. denied.* Thus, the Fund is appealing an adverse judgment. "When the trial court enters findings in favor of the party bearing the burden of proof, the findings are clearly erroneous if they are not supported by substantial evidence of probative value." *Id.* "[W]e will reverse such a judgment even where we find substantial supporting evidence, if we are left with a definite and firm conviction a mistake has been made." *Id.*

■ The Fund argues the Settlement Agreement does not satisfy the Act's requirement that the present money payments plus the cost of a periodic payments agreement exceed $75,000.00. At the time Walsko filed his proposed complaint, Indiana's Medical Malpractice Act (the "Act") limited health-care providers' malpractice liability to $100,000. *See* Ind. Code § 34–18–14–3(b), (d) (formerly I.C. § 16–9.5–2–2.2).[3] Indiana Code section 34–18–14–4(b) provides as follows:

---

**3.** We shall apply the recovery limitations set forth at the time Walsko filed his proposed

If the health care provider agrees to discharge its possible liability to the patient through a periodic payments agreement, the amount of the patient's recovery from a health care provider in a case under this subsection is the amount of any immediate payment made by the health care provider or the health care provider's insurer to the patient, plus the cost of the periodic payments agreement to the health care provider or the health care provider's insurer. For the purpose of determining the limitations on recovery stated in section 3(b) and 3(d) of this chapter and for the purpose of determining the question under IC 34–18–15–3 of whether the health care provider or the health care provider's insurer has agreed to settle its liability by payment of its policy limits, the sum of:

(1) the present payment of money to the patient (or the patient's estate) by the health care provider (or the health care provider's insurer); plus

(2) the cost of the periodic payments agreement expended by the health care provider (or the health care provider's insurer);

must exceed seventy-five thousand dollars ($75,000).

The question of whether a health-care provider or its insurer has "agreed to settle its liability by payment of its policy limits" is critical because a patient may seek payment from the Fund only "[i]f a health-care provider or its insurer has agreed to settle its liability on a claim by payment of its policy limits of one hundred thousand dollars ($100,000)[.]" I.C. §§ 34–18–14–4(b); 34–18–15–3. Pursuant to

Indiana Code section 34–18–14–4(b), a health-care provider or its insurer may meet the liability limits by entering into a periodic payments agreement, which along with a lump sum payment to the patient exceeds $75,000.

Indiana Code section 34–18–14–2 defines "periodic payments agreement" as follows:

As used in this chapter, "periodic payments agreement" means a contract between a health care provider (or its insurer) and the patient (or the patient's estate), under which the health care provider is relieved from possible liability in consideration of:

(1) a present payment of money to the patient (or the patient's estate); and

(2) one (1) or more payments to the patient (or the patient's estate) in the future;

whether or not some or all of the payments are contingent upon the patient's survival to the proposed date of payment.

Indiana Code section 34–18–14–1 defines "cost of the periodic payments agreement" as follows:

As used in this chapter, "cost of the periodic payments agreement" means the amount expended by the health care provider (or its insurer), the commissioner, or the commissioner and the health care provider (or its insurer), at the time the periodic payments agreement is made, *to obtain the commitment from a third party to make available money for use as future payment,* the total of which may exceed the limits provided in section 3 of this chapter.

(Emphasis added).

The Fund contends that Walsko did not show that the Settlement Agreement satis-

---

complaint. *See Eakin,* 567 N.E.2d at 149 n. 3 (applying 1985 amendment to Title 16 because patient initiated claim by filing proposed complaint after June 1, 1985). For convenience, however, we will cite to current

sections of Title 34, substituting the recovery limitations and payments provided by now-repealed Title 16, which was in effect when Walsko filed his proposed complaint, where necessary.

fied the Act's provisions allowing a health-care provider to discharge its liability by spending more than $75,000 in the form of an immediate payment and the cost of a periodic payments agreement because he failed to present evidence that the Health-Care Providers obtained a "commitment from a third party to make available money for use as future payments[.]"[4] I.C. § 34–18–14–1. Rather, the Settlement Agreement only provides that

> 5.1 [T]he Defendants *may* make a "qualified assignment," . . . of the Defendants' and/or the Insurer's liability to make the Periodic Payments set forth in Section 2.2 to Providian Assignment Corporation.
>
> * * *
>
> 5.2 Any such assignment, *if made,* shall be accepted by the Claimant. . . . The Claimant recognizes that, *in the event of such an assignment* . . . .
>
> * * *
>
> The Defendants and/or the Insurer, itself or through its Assignee, *reserve the right* to fund the liability to make the Periodic Payments through the purchase of an annuity policy from Commonwealth Life Insurance Company.

(App. 33–34) (emphasis added). Given the Settlement Agreement's language, the Fund maintains that "the [Settlement] Agreement permitted, but did not require, [the Health–Care Providers] to purchase a commitment from a third party to make available money for use as future payment." Fund's Br. 10. Furthermore, the Fund maintains that Walsko failed to present any evidence that a commitment from a third party was purchased.

In *Patient's Comp. Fund v. Hicklin,* 823 N.E.2d 705 (Ind.Ct.App.2005), this Court addressed whether a settlement agreement, whereby a hospital agreed to make an immediate payment of $75,000 and a payment in the amount of $1 one week later, satisfied the Act's provision allowing a health care provider to discharge its liability pursuant to Indiana Code section 34–18–14–4(b). The Fund in that case argued that there was no periodic payments agreement, and because the hospital neither made a lump sum payment of $100,000 under Indiana Code section 34–18–14–4(a) nor purchased a periodic payments agreement at a total cost of $75,000 under Indiana Code section 34–18–14–4(b), the patient could not access the Fund.

Determining that the hospital made a direct payment of $1 to the patient "instead of funding the 'cost of [a] periodic payments agreement,'" this Court found "there is no evidence that [the hospital] 'obtained a commitment from a third party to make available money for use as future payment[,]' which is the essence of a periodic payments agreement." 823 N.E.2d at 708–09. This Court continued:

> While it is also clear that Section 4(b) permits health care providers and their insurers to save thousands of dollars by purchasing periodic payment agreements in lieu of lump-sum payments, nothing in the rationale and policy underlying the Act indicates that the legislature intended that a health care provider could satisfy its obligation under the statute by making two direct payments to the claimant totaling $75,001. While the Act does not expressly require that the periodic payments eventually pay out $100,000 over time, it would produce an absurd result if the Act were

---

**4.** The Fund did not argue this specific issue at trial. It did, however, raise as an affirmative defense that Walsko failed to satisfy the conditions precedent outlines in Indiana Code sec-
tion 34–18–14–4 and also raised the issue in its proposed findings of fact and conclusions of law.

construed to permit a health care provider to satisfy its statutory obligation by paying only $75,001 directly to the claimant.

*Id.* at 710 (footnote omitted). Accordingly, this Court held that because the agreement between the hospital and the patient did not satisfy the requirement that the "health-care provider spend more than $75,000 on the sum of an immediate payment (or present payment) to the claimant and the cost of a periodic payments agreement," the patient's estate was not entitled to access the Fund. *Id.*

In this case, Walsko presented evidence that he and the Health–Care Providers entered into the Settlement Agreement. Walsko, however, presented no evidence that the Health–Care Providers obtained a "commitment from a third party to make available money for use as future payment[.]" *See* I.C. § 34–18–14–1.

Furthermore, even assuming that the Health–Care Providers have obtained the requisite "commitment from a third party to make available money for use as future payment," the amount they have "*expended*" must exceed $75,000. I.C. §§ 34–18–14–1 (The " 'cost of the periodic payments agreement' means the amount *expended* by the health care provider (or its insurer) . . . at the time the periodic payments agreement is made."); 34–18–14–4(b) ("[T]he sum of: (1) the present payments of money to the patient . . . by the health care provider (or the health care provider's insurer); plus (2) the cost of the periodic payments agreement *expended* . . . must exceed seventy-five thousand dollars[.]") (emphasis added).

The legislature's definition of a word is binding when we construe a statute. *Koppin v. Strode,* 761 N.E.2d 455, 461 (Ind.Ct. App.2002), *trans. denied.* "When the legislature has not defined a word, we give the word its common and ordinary mean-

ing." *Id.* In determining the common and ordinary meaning of a word, we may consult English language dictionaries. *Id.*

■ "Expend" means "to pay out." *See* Merriam–Webster Dictionary at *http:// www.mw.com/dictionary/expend* (Oct. 16, 2006). Thus, where liability is discharged through a periodic payments agreement, the health-care provider or its insurer must have "paid out" an amount, which along with the present payment to the patient, exceeds $75,000 *before* the patient may make a claim against the Fund. *See Eakin,* 567 N.E.2d at 150 ("The health care providers must satisfy their obligation before access to the Fund is allowed."). Requiring the Fund to pay excess damages prior to a health-care provider or its insurer satisfying its obligation could result in the Fund paying damages without any contribution from the health-care provider, which would contravene the Act. *Id.*

Here, the Settlement Agreement provided that "the Defendants and Insurer represent to the Claimant that the present payment to the Claimant of $60,100.00 plus the cost of the Periodic Payments equals, and has a present value of, $75,100.00." (App. 33). The trial court found that "[w]ith these statements by the defendants and the insurance company in the underlying case, the Court finds that the jurisdictional elements of the Medical Malpractice Act have been satisfied." (App. 8–9).

Walsko, however, presented no evidence that the Health–Care Providers actually expended an amount on a periodic payments agreement, which along with their lump-sum payment of $60,100, exceeded $75,000. Rather, as of the date Walsko filed his complaint against the Fund, the Health–Care Providers would have expended only $70,100 (the initial lump-sum payment of $60,100 plus a $10,000 payment in 2005) pursuant to Section 2.0 of the

Settlement Agreement, which is less than the limitation on recovery under Indiana Code section 34–18–14–3 and less than the $75,000 expenditure required to constitute payment of the policy limits under Indiana Code section 34–18–14–4(b).

We find that the evidence does not support the trial court's findings that the Settlement Agreement satisfied the Act's requirements for access to the Fund. Specifically, the Settlement Agreement does not satisfy the requirement that, where a health-care provider or its insurer enters into a periodic payments agreement with the patient, the health-care provider or its insurer must obtain a commitment from a third party, the cost of which, along with the present payment of money, must exceed $75,000. As such, the trial court erred in awarding Walsko excess damages, to be paid from the Fund.

Reversed.

NAJAM, J., and FRIEDLANDER, J., concur.