**RALPH E. KORESSEL PREMIER ELECTRIC, INC., Appellants–Defendants,**

v.

**Randall O. FORSTER, Appellee–Plaintiff.**

No. 87A01–0412–CV–549.

Court of Appeals of Indiana.

Dec. 8, 2005.

Rehearing Denied Feb. 15, 2006.

Leslie C. Shively, Shively & Associates, Evansville, for Appellants.

Warren C. Mathies, Long & Mathies Law Firm, P.C., Boonville, for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ralph E. Koressel and Premier Electric, Inc. appeal the trial court's judgment in favor of Randall O. Forster.

We affirm.

### ISSUES

1. Whether the trial court's judgment is void as inconsistent with the pleadings.

2. Whether the evidence supports the findings and the findings support the judgment.

3. Whether the minimum commission constitutes an unenforceable penalty.

### FACTS

Ralph E. Koressel ("Ralph") owned Premier Electric, Inc. ("Premier") (collectively, Ralph and Premier shall be referred to as "Koressel"). Randall O. Forster ("Forster") was a business broker and also "d[id] commercial real estate." (Forster's App. 18). On or about January 13, 1999, Ralph and Forster entered into a Standard Listing Agreement (the "Listing Agreement"), whereby Ralph granted Forster the exclusive right to sell Premier for one year. The Listing Agreement read as follows:

In consideration of the mutual covenants in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. Seller hereby grants to Broker the EXCLUSIVE RIGHT TO SELL and authority to act as agent to arrange the sale of the Business or part thereof described as follows:

A. Name: Premier Electric, Inc.

. . . .

E. Assets Included in Sale: all assets tangible and intangible owned by the Seller and used in the day-to-day operation of the business; including, but not limited to, inventory, equipment, fixtures, vehicles (except personal vehicle), records, files, furniture, acquired contracts, trade names & marks or rights, etc. Other than items specifically listed on an "Excluded Items" list

. . . .

G. Real Estate Included in Sale: None

H. Sale Price: $2,500,000

. . . .

2. Seller hereby grants the EXCLUSIVE RIGHT TO SELL to Broker for a primary period of ONE (1) year from the date of this Agreement. After the primary period, this Agreement shall continue until terminated by operation of law or upon TEN (10) days written notice to termination delivered by ONE (1) party to the other. If not otherwise terminated, this Agreement shall terminate on Feb. 1, 2000.

3. If the Seller effects the sale of a Related Business during the existence of this Agreement or within TWO (2) years after the termination of this Agreement and such sale is made to any purchaser or prospective purchaser with whom Broker or any cooperating Broker had any contact regarding the sale of the Business during the existence of this Agreement, Broker shall be entitled to a commission on the sale in accordance with Paragraph 10 hereof (The term "Related Business" shall mean and include any property and/or business that is directly related to the Business described above, e.g., real estate or other property connected with the Business, etc., and that is owned in whole or part

by the same persons or legal entities that own the Business. "Related Business" shall also mean and include other businesses and/or other locations if such other businesses and/or locations are engaged in the same general business activities as the Business described above.)

. . . .

9. Upon the execution of this Agreement, Seller shall pay to Broker a non refundable [sic] retainer in the amount of $0. In the event a commission is earned and payable upon the occurrence of any event as described in Paragraph 11 of this Agreement, the retainer shall be applied as a credit to such commission. If no commission is due to or earned by Broker, then Broker shall keep the retainer as compensation for services hereunder. However, in the event a commission is due or earned by Broker hereunder, neither the retainer, nor the retention thereof by Broker, will be considered liquidated damages, payment, waiver, estoppel, accord and satisfaction, release or other discharge of Seller's obligation to pay the commission otherwise due to or earned by Broker hereunder.

10. For services rendered by Broker under this Agreement, Seller shall pay to Broker a commission in cash to a certain percent or percentage of the Sale Price of said Business or Related Business, such percentage of the Sale Price to be on a scale as follows:

A. Six (6%) percent

B. In no event shall the commission payable to Broker be less than $50,000 (minimum commission).

11. The commission described in Paragraph 10 shall be earned by and payable to Broker, in cash, upon the occurrence of any of the following events:

A. The sale of the Business during the existence of this Agreement.

B. The sale of the Business at any time within two (2) years after the termination of this Agreement, if such sale is made to any purchaser or prospective purchaser with whom the Broker (or any cooperating broker), Seller, or any agent or employee of Seller had any contact regarding same during the existence of this Agreement.

C. Broker obtains an offer to purchase the Business upon terms and conditions specified in Paragraph 1 or upon other terms and conditions acceptable to Seller from a ready, willing and able prospective purchaser.

D. Seller accepts in writing an offer from a prospective purchaser and Seller then fails to complete the sale of the Business.

E. Seller violates the terms of this Agreement and/or breaches any material warranty or representation made herein, or withdraws the Business from the market and/or otherwise attempts to terminate this Agreement prior to its expiration date.

F. The sale of a Related Business as described in Paragraph 3.

12. The term "sale" is defined as any transfer, conveyance, merger, consolidation, exchange, creation of partnership, indenture or disposition of the Business, including, without limitation, the sale, consignment, assignment, lease or hypothecation of the Business or a Related Business, its capital stock, assets, or any portion thereof (other than in the ordinary course of business), or the employment of a prospective purchaser introduced to Seller by Broker.

13. The term "Sale Price" shall mean any and all amounts of money or other consideration paid or conveyed to Seller, or for Seller's benefit, or paid or conveyed by a purchaser in connection with

the sale of the assets or capital stock of the Business or a Related Business.... In addition, Sale Price shall specifically include any and all payments made or to be made by a purchaser that are contingent upon future events ....

(Forster's App. 1–2) (emphasis in original). Forster then gathered information regarding Premier and prepared a prospectus for potential buyers.

Brent Smith heard that Premier was for sale, and in June of 1999, he contacted Ralph and expressed interest in purchasing Premier. Ralph referred Smith to Forster. On June 10, 1999, Smith entered into a confidentiality agreement, and Forster provided Smith with a copy of the prospectus.

On July 2, 1999, Forster met with Smith and an officer from Old National Bank to discuss financing the purchase of Premier. Some time at the end of August of 1999, Ralph and Smith had a meeting, during which Ralph agreed to sell Premier to Smith for $2,000,000. On September 13, 1999, Smith, Ralph, Forster, and Ralph's accountant, Malcolm Neel, met to discuss financing. On October 1, 1999, Civitas Bank offered a loan commitment to Smith for the purchase of Premier. Smith, Ralph, Forster, and Neel met again on October 2, 1999, to further discuss the sale of Premier. They then met with Cass Wilson, Smith's attorney, who drew up a rough draft of a purchase agreement.

On October 13, 1999, Forster met with Ralph and Smith. Ralph notified Forster that he did not intend to pay Forster any commission on the sale of Premier because he felt that Forster had not "done any work, enough to justify it ...." (Tr. 25). Forster informed Ralph that he was due a commission pursuant to the Listing Agreement. Ralph then told Forster that he would pay him the minimum commission of $50,000. Forster advised Ralph that he would contact his attorney. Shortly after the October 13 meeting, Forster received a letter from Ralph's attorney, informing him that he was being terminated because he did not have a real estate license.

On November 1, 1999, Ralph entered into a purchase and sale agreement (the "Purchase Agreement") with Smith and Smith's wife, Sarah. Pursuant to the Purchase Agreement, Ralph agreed to sell to the Smiths certain assets of Premier in exchange for a purchase price of two million dollars ($2,000,000). Ralph also agreed to "convey enough cash and good collectable accounts receivable as of the Closing Date, to equal Five Hundred Thousand Dollars ($500,000.00)." (Forster's App. 4). The Purchase Agreement also provided as follows:

> 2. *Lease of Real Estate.* At the Closing the Purchaser and Koressel agree to enter into a Lease Agreement for a period of ten (10) years for an initial rent of Two Thousand Dollars ($2,000.00) per month. The rental amount shall be adjusted annually by the Consumer Price Index, not to exceed five percent (5%) per year. After five (5) years either party shall have the right to terminate the lease after giving six (6) months prior written notice. The lease shall be a triple net lease. The remainder of the terms and conditions of the Lease Agreement shall be agreed to by both parties.
>
> ....
>
> 5. *Purchase Price/Payment/Allocation.* The purchase price to be paid Seller for all of the Assets to be transferred to Purchaser hereunder shall be Two Million Dollars ($2,000,000.00), hereinafter referred to as the "Purchase Price." Purchaser shall pay the Purchase Price to Seller as follows:
>
> ....

(d) In the event Seller and Koressel are required to make any payment to R.O. Forster & Associates, Inc. as required by Paragraph 20, herein, the Purchase Price shall be increased by the amount of said payment, added to the amount in subparagraph (c) above with the monthly payment being adjusted accordingly.

. . . .

16. Conditions Precedent to Obligation of Purchaser. The obligations of Purchaser pursuant to this Agreement are subject to the satisfaction and fulfillment prior to or at the Closing of the following conditions, except as may be specifically waived by Purchaser:

. . . .

(b) *Items to be Delivered by Seller at Closing.* At Closing, Seller and Koressel will deliver or cause to be delivered to Purchaser the following:

. . . .

(iii) *Consulting Agreement.* A Consulting Agreement executed by Seller and Koressel in the form of Exhibit "H"

. . . .

(Forster's App. 4–11). The Purchase Agreement further provided that the sale of Premier would close on or before January 15, 2000. Exhibit "H" to the Purchase Agreement provided that Ralph would provide consultation services for Premier for three years at a rate of $45,000.00 per year.

Prior to closing, Smith met with Ralph to discuss in what combination Ralph wanted to convey the $500,000 worth of cash and collectable accounts that was to be part of the assets sold to Smith. Ralph, however, told Smith that Smith "was absolutely crazy if [Smith] thought he was go-

ing to be leaving a half a million dollars in the company . . . ." (Tr. 86–87). That conversation with Ralph, along with other factors, caused Smith to "los[e] complete trust" in Ralph and the sale. (Tr. 87). Although Ralph later agreed to keep the $500,000 in Premier, Smith refused to close on the sale of Premier and relinquished his earnest money.

On April 27, 2000, Forster filed a complaint against Koressel for breach of contract and sought damages in the amount of $184,459.[1] Koressel filed an answer, affirmative defenses and counterclaim, asserting, *inter alia,* that Forster breached the Listing Agreement and that the Listing Agreement "is void due to illegality" because Forster was not properly licensed in Indiana to engage in the sale of Premier. (Koressel's App. 146).

The trial court heard evidence on July 26 and July 27, 2004. Koressel requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. On December 2, 2004, the trial court entered its findings of fact, conclusions of law and judgment. The trial court found that "[b]y his statements to and conduct toward Forster at the time of their meeting on October 13, 1999, [Ralph] effectively terminated their agency relationship and the contract between them . . . ." (Koressel's App. 20). The trial court further found that "Indiana law does not require Forster to be licensed as a real estate broker to serve as Koressel's agent for the sale of Premier, and pursuant to the [Listing Agreement] entered into between the parties for the sale of the business." (Koressel's App. 21). The trial court ordered Koressel to pay Forster $70,250, which included the minimum commission under

---

1. Forster's claimed damages included a six percent commission on (1) the sale price of Premier in the amount of $2,000,000; (2) the brokerage-fee price increase pursuant to

paragraph 5(d) of the Purchase Agreement; and (3) the consulting fee paid to be paid to Ralph in the total amount of $135,000.

the Listing Agreement plus prejudgment interest accruing since "Koressel's October 13, 1999 termination of Forster ...." (Koressel's App. 22).

## DECISION

### 1. *Indiana Trial Rule 15(B)*

 Koressel contends that the trial court's judgment is void because it is inconsistent with the pleadings. Citing Indiana Trial Rule 15(B), Koressel maintains that "Forster's claim was limited to his claimed right for commission under paragraphs 11(C) and 11(D) of the [L]isting [A]greement ... which is the only basis for relief for which Forster sought compensation pursuant to Forster's complaint and the evidence presented ...." Koressel's Br. 7–8. Although Koressel fails to make a cogent argument,[2] it seems that Koressel is arguing that the trial court erred in concluding that "Koressel's breach of paragraph [11(E)] of the [L]isting [A]greement, by terminating Forster and the agreement on October 13, 1999 ... obligate[d] Koressel to pay to Forster the minimum commission ...." Koressel's App. 21.

 Generally, "the issues in a case are established by the evidence introduced at trial rather than by the pleadings." *Curtis v. Clem*, 689 N.E.2d 1261, 1264 (Ind.Ct. App.1997). Trial Rule 15(B) provides in part as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues.

In this case, Forster's complaint asserted that Koressel breached the Listing Agreement and that Forster was entitled to a commission pursuant to paragraph 11 of the Listing Agreement, including subparagraph (E). During his direct examination, Forster testified that he believed paragraph 11(E) applied "100%" to his case. Forster's App. 56. Forster also testified that Ralph informed him at the meeting on October 13, 1999, that he did not intend to pay Forster a commission on the sale of Premier. Furthermore, Ralph testified that his attorney sent Forster a letter, and "the reason for that letter was termination on grounds that [Forster] wasn't licensed to do the deal." Forster's App. 67.

Given these facts, we find that Forster alleged and litigated that Koressel violated the terms of the Listing Agreement and terminated the Listing Agreement. Thus, Forster's claims were not limited to paragraphs 11(C) and 11(D) of the Listing Agreement.

### 2. *Findings of Fact and Conclusions of Law*

Koressel asserts that the trial court's conclusion "that Koressel breached the [L]isting [A]greement is unsupported by

---

**2.** An "argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal ...." Ind. Appellate Rule 46(A)(8)(a). Koressel's only citation to authority is to state that "[t]he only issues which to be considered by the trial court are those issues which are specifically plead or tried by expressed or implied consent of the parties." Koressel's Br. 7. Koressel also fails to cite to any portion of the trial court's findings of fact, conclusions of law and judgment that may be erroneous.

the evidence and is contrary to law." Koressel's Br. 8. Koressel further asserts that the trial court erred in concluding that "Indiana law does not require Forster to be licensed as a real estate broker to serve as Koressel's agent for the sale of Premier, and pursuant to the [Listing Agreement] entered into between the parties for the sale of the business." Koressel's App. 21.

■ When a party has requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 36 (Ind.Ct.App.2002), *trans. denied.* In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.* Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Id.*

### A. Anticipatory Breach

■ Koressel argues that the trial court erred in finding that Koressel antici-patorily breached the Listing Agreement. We disagree.

■ "Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." *Angelone v. Chang,* 761 N.E.2d 426, 429 (Ind.Ct.App.2001). The repudiating statement must be clear and absolute. *Id.*

In this case, Ralph, Smith and Forster met on October 13, 1999. At this point, Smith had agreed to purchase Premier for $2,000,000, a price that was acceptable to Ralph. Ralph, however, refused to pay Forster any percentage of the sale price. Rather, Ralph later offered to pay Forster the minimum commission of $50,000. Ralph's attorney subsequently sent a letter to Forster, terminating Forster.

In the face of such conduct, Forster could justifiably assert repudiation of the Listing Agreement. Accordingly, we find that the evidence supports the trial court's finding that Ralph's statements and conduct effectively terminated the Listing Agreement, and the findings support the trial court's conclusion that Koressel breached the Listing Agreement.[3]

### B. Real Estate License

■ Koressel argues that Forster is prohibited from collecting a commission because the Purchase Agreement provided for the lease of real property; the Listing Agreement provides for a commission on the sale of a "Related Business," the definition of which includes real estate; and the Listing Agreement defines "Sale Price" as "all amounts of money or other

---

**3.** Koressel also argues that Forster is not entitled to a commission pursuant to either paragraph 11(C) or 11(D) of the Listing Agreement. The trial court, however, did not find Forster was entitled to a commission under these sections of the Listing Agreement. Moreover, because we find that Forster is entitled to a commission under paragraph 11(E), we shall not address Koressel's contention as to paragraphs 11(C) and 11(D) of the Listing Agreement.

consideration paid or conveyed to Seller," including real property, rental agreements and lease agreements. Forster's App. 1 and 2.

Pursuant to Indiana Code section 25–34.1–3–2, "no person shall, for consideration, sell, buy, trade, exchange, option, lease, rent, manage, list, or appraise real estate or negotiate or offer to perform any of those acts in Indiana or with respect to real estate situated in Indiana, without a license." When the sale of business assets includes an interest in real estate, "no matter how de minimus," the salesperson or broker is not entitled to any commission if he does not have a license to sell real estate. *GDC Envtl. Servs., Inc. v. Ransbottom Landfill,* 740 N.E.2d 1254, 1259 (Ind.Ct.App.2000). In order to avoid Indiana's license requirement, "a person may *do no more* than act as a finder." *Id.* (emphasis in original). Where a brokerage agreement limits a sale to personal property, a person is not statutorily prohibited from recovering a commission on the sale of such personal property. *See Abex Corp. v. Vehling,* 443 N.E.2d 1248, 1253 (Ind.Ct.App.1983), *reh'g denied.*

In this case, the trial court found that "at no time was real estate included in the [L]isting [A]greement or any transaction in which Forster participated as Koressel's agent or broker." Koressel's App. 17. Accordingly, the trial court concluded that "Indiana law does not require Forster to be licensed as a real estate broker to serve as Koressel's agent for the sale of Premier, and pursuant to the [Listing Agreement] entered into between the parties for the sale of the business." Koressel's App. 21.

Here, there was no sale of Premier for which Forster could earn a commission. Rather, Ralph breached the Listing Agreement, entitling Forster to liquidated damages of $50,000. Furthermore, the evidence shows that up until Ralph breached

the Listing Agreement, Forster did no more than prepare and present information regarding Premier and participate in meetings regarding financing. Although the Purchase Agreement did provide for the lease of real property, Ralph and Smith entered into it subsequent to Ralph's termination of the Listing Agreement and Forster.

As to the Listing Agreement, "provisions of a contract are to be construed together and specific terms control over general terms." *Arnold v. Burton,* 651 N.E.2d 1202, 1205 (Ind.Ct.App.1995), *trans. denied.* "Where the parties have agreed to a specific term, an apparently inconsistent general statement must yield to the more specific term." *Id.*

Here, paragraph 1(G) of the Listing Agreement provides that no real estate would be included in the sale of Premier. Paragraph 3 of the Listing Agreement, however, also defines a "Related Business" as including real estate. Paragraph 13 provides that the "Sale Price" may include real estate conveyed to the seller of Premier. Because paragraph 1(G) is the more specific term, it controls. Therefore, real estate was not included in the sale of Premier pursuant to the Listing Agreement. Accordingly, we find no error with the trial court's findings and conclusions.

### 3. *Unenforceable Penalty*

Koressel further asserts that even if he breached the Listing Agreement, the minimum commission provided for by paragraph 11(E) constitutes an unenforceable penalty because it "is an attempt to establish a liquidated damages provision." Koressel's Br. 12.

Whether a liquidated damages clause is valid, or whether it constitutes an unenforceable penalty, is a question of law for the court. *Gaddis v. Stardust Hills*

*Owners Ass'n, Inc.*, 804 N.E.2d 231, 236 (Ind.Ct.App.2004). "The term 'liquidated damages' applies when a specific sum of money has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by either party for a breach of the contract by the other." *Rogers v. Lockard*, 767 N.E.2d 982, 990 (Ind.Ct.App.2002). Liquidated damages are to be paid in lieu of performance whereas a penalty is imposed to secure performance of the contract. *Id.* at 991. A " 'typical liquidated damages provision provides for the forfeiture of a stated sum of money upon breach without proof of damages.' " *Gaddis*, 804 N.E.2d at 236 (quoting *Gershin v. Demming*, 685 N.E.2d 1125, 1127 (Ind.Ct.App.1997)). " 'In determining whether a stipulated sum payable on a breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances of the case are all to be considered.' " *Id.* We treat the sum sought by a liquidated damages clause as a penalty rather than liquidated damages if the sum is grossly disproportionate to the loss that may result from a breach of contract. *Id.*

Paragraph 10(B) of the Listing Agreement provides that "[i]n no event shall the commission payable to Broker be less than $50,000 (minimum commission)."[4] Forster's App. 1. Paragraph 11(E) provides that the commission described in paragraph 10 shall be earned and payable upon the occurrence of the following event: "Seller violates the terms of this Agreement and/or breaches any material warranty or representation made herein, or withdraws the Business from the market and/or otherwise attempts to terminate this Agreement prior to its expiration date." Forster's App. 2. Providing for a flat rate in the event of breach of the Listing Agreement fits within the definition of liquidated damages.

Koressel, however, essentially argues that Forster did not work enough to justify the payment of the $50,000, and therefore, it is an unenforceable penalty. Koressel contends that Forster only obtained one prospective buyer; failed to obtain another purchaser once the sale to Smith terminated; and did not prepare the documents essential to the sale of Premier. We find Koressel's argument unpersuasive.

The evidence shows that Forster developed a prospectus for Premier, advertised the sale of Premier, and provided confidentiality agreements to prospective buyers. Forster testified that he was working with at least one other potential buyer, but Ralph insisted on selling Premier to Smith. Furthermore, Ralph terminated Forster before Smith withdrew from the sale, thereby, obviating any need for Forster to obtain a new purchaser, and in fact, preventing Forster from earning a greater commission of six percent of the Sale Price. Given these facts, we find that the $50,000 is not an unenforceable penalty.

Judgment affirmed

SHARPNACK, J., and BAILEY, J., concur.

---

**4.** Paragraph 10(A) provided for a percentage of the "Sale Price" as a commission. Forster's App. 1. Since there was no applicable Sale Price, as defined in paragraph 13 of the Listing Agreement, this provision does not apply.