Robert K. YEAGER, John M. Yeager and Marilyn J. Duran, and Yeager Realty, LLC, Appellants–Defendants,

v.

David A. McMANAMA, Cheryl S. McManama, Jack L. Cottey and Christina L. Cottey, Appellees–Plaintiffs.

No. 49A02–0607–CV–614.

Court of Appeals of Indiana.

Oct. 12, 2007.

James A. Goodin, Goodin Abernathy & Miller, LLP, James N. Scahill, Indianapolis, IN, Attorneys for Appellants.

David M. Brooks, Brooks Koch & Sorg, Indianapolis, IN, Attorney for Appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Yeager Realty, LLC ("Developer"), and Robert K. Yeager, John M. Yeager, and Marilyn J. Duran individually (collectively, "the Yeagers" [1]) appeal the judgment entered by the trial court after a bench trial in the action brought against them by David A. McManama, Cheryl S. McManama, Jack L. Cottey, and Christina L. Cottey (collectively, "the Plaintiffs" [2]).

We affirm.

### ISSUES

1. Whether the trial court erred in denying the Yeagers' motion for summary judgment.

2. Whether the trial court erred in its order on summary judgment by holding that the Developer and the Yeagers owed duties to the Plaintiffs.

3. Whether the trial court erred in concluding, after trial, that the Developer and the Yeagers were liable to the Plaintiffs.

### FACTS

The Yeagers were the sole members and owners of the Developer, which owned and was the developer of a Planned Unit Development project known as Murphy's Landing, located on the south side of Marion County. In June of 1994, the Developer—the Yeagers—executed and recorded the Declaration of Covenants and Restrictions of the Murphy's Landing Ownership ("the Declaration"), with specific language applying to Emerald Highlands and an attached conceptual site plan for a number of separately named residential areas in Murphy's Landing—including Emerald Highlands.

On March 1, 2000, the Plaintiffs filed their complaint, with attached copies of the Declaration and its conceptual site plan, including the Emerald Highlands at Murphy's Landing Architectural Standards ("the architectural standards"). The complaint alleged in Count I: Fraud or Constructive Fraud or Fraudulent Concealment, and Count II: Breach of Fiduciary Duty. Specifically, the Plaintiffs alleged that they had purchased lots and constructed very expensive homes in Emerald Highlands relying on the representations as to the high quality standards for homes in Emerald Highlands made by the Developer, the Yeagers, and by builder Steven Morse—the Developer-approved exclusive builder for homes there, as reflected in the Declaration. The Plaintiffs further alleged that pursuant to the Declaration, the Yeagers were the sole members of the Architectural Review Board, the duty of which was to "regulate the external design, appearance, use and location of improvements on the Real Estate in such manner as to preserve and enhance values and to maintain a harmonious relationship amongst structures, improvements and the natural vegetation and topography" of Emerald Highlands. (Complaint, quoting the Declaration at Section 14, subsection

---

1. John Yeager and Marilyn Duran are the children of Robert Yeager.

2. The only complaint included in the three Appendices submitted by the parties is the initial complaint filed on March 1, 2000. It names only David McManama and Christina L. Cottey as plaintiffs. Subsequent filings by the parties prior to the trial court's order on summary judgment included additional plaintiffs in the caption, but the caption of the trial court's order on summary judgment order reflects only the two original plaintiffs. However, the order after trial and all the parties' briefs reflect four named plaintiffs. Thus, we assume that the original complaint was amended in this regard at some point.

(b)). The Plaintiffs further alleged that by allowing construction of homes "not of comparable size and quality," the Developer and the Yeagers had breached their duties and responsibilities pursuant to the Declaration and their representations[3] that Emerald Highlands would consist of large custom homes. (Complaint, p. 4). The Plaintiffs alleged that their resulting injury was a significant reduced value of their homes.

According to the CCS, on January 15, 2004, the Yeagers filed a motion for summary judgment and designation of evidence.[4] The Yeagers argued that they were "entitled to judgment as a matter of law because: 1) the doctrines of fraud and constructive fraud do not apply; 2) there is no fiduciary duty between the parties; and 3) fraudulent concealment is not procedurally applicable to this case." (Yeagers' App. at 59). Specifically, the Yeagers argued that because "alleged statements" regarding home construction in Emerald Highlands were "statements implicat[ing] future behavior," and/or were "not statements of fact" but "mere opinions," the Plaintiffs had failed to show "a material misrepresentation of past or existing fact" and, therefore, could not "state a claim for fraud." *Id.* at 60, 61, 59, 61. The Yeagers further asserted that designated evidence revealed "insufficient contacts between"

the Plaintiffs and "the Yeagers and [the Developer] upon which to ground a claim for constructive fraud or fiduciary duty." *Id.* at 62. Finally, the Yeagers argued that fraudulent concealment was "an equitable doctrine" that was inapplicable because there was no statute of limitations defense here. *Id.* at 64.

The Plaintiffs filed their response in opposition to the Yeagers' motion for summary judgment on March 8, 2004. Therewith, they submitted designated evidence and a memorandum arguing that their evidence established the following facts.

The Plaintiffs argued that the designated evidence established that pursuant to the Declaration, the Homeowner Association ("HOA") was granted complete control over the management and operation of Murphy's Landing. Management of the HOA was vested in its Board of Directors. The initial board—in place until December of 2001—consisted solely of the Yeagers. The Yeagers were also the sole members of the Architectural Review Board during the relevant time period. The Developer had initially made Steven Morse the exclusive builder for Emerald Highlands and given him responsibility for lot sales and information. At the Developer's request, Morse had created the architectural standards for Emerald Highlands to make it

---

**3.** The complaint alleged that Morse told Mrs. Cottey that Emerald Highlands would be a "very exclusive community," that Murphy's Landing would be the "showplace of the South side" and "an exclusive 'Hilton Head Island' community," with the Developer "ensur[ing] that such standards would be met." (Complaint, p. 3). The complaint also alleged that Duran told Mr. McManama "that if they built the large home [he] envisioned, she would make sure they were 'protected,' and that [he] didn't have anything to worry about" because Emerald Highlands "would contain exclusive custom homes." (Complaint, p. 4).

**4.** The motion is not included in any of the four separate Appendices. The Yeagers' brief states that they and the Developer filed the motion for summary judgment, citing the CCS. However, the CCS simply states that on that date a motion for summary judgment was filed. The January 15, 2004, brief in support "of Defendants [sic] Motion for Summary Judgment" filed by the Yeagers indicates that it is "in Support of Their Motion for Summary Judgment." (Yeagers' Appendix at 56). Similarly, the January 15, 2004, designation of evidence submitted by the Yeagers indicates that it is "in support of their Motion for Summary Judgment." (Yeagers' Appendix at 67).

the most exclusive section of the Murphy's Landing areas. The Developer and the Yeagers authorized Morse to answer all potential buyers' inquiries about Emerald Highlands.

The Plaintiffs also argued that the designated evidence established that Mrs. Cottey inquired of Morse about possibly building a very large, expensive home on a lot in Emerald Highlands. Morse informed her that Emerald Highland homes would be very exclusive and upscale, with an architectural review board to ensure that future homes built there would preserve and enhance the value of such a home. The Cotteys bought a lot from Morse for the purpose of building an approximately 6,000 square foot home on it, thereby becoming members of the HOA. The Cotteys then had the large home built.

The Plaintiffs further asserted that the designated evidence established that the McManamas also discussed with Morse the purchase of a lot in Emerald Highlands. They made a deposit with him towards the purchase of a lot. Subsequently, the Developer terminated its relationship with Morse, and Morse told the McManamas to contact Duran regarding the purchase of the lot.[5] The McManamas made contact and discussed with Duran the size and quality of homes for Emerald Highlands, expressing their desire to build a very large brick home. On behalf of the Developer and the Yeagers, Duran assured the McManamas that future homes would be of size and value comparable to theirs. The McManamas proceeded to buy a lot in Emerald Highlands to build an approximately 5,000 square foot home on it.

Finally, the Plaintiffs argued that the designated evidence established that subsequent to the construction by the Plaintiffs of their homes, the Developer and the Yeagers approved the nearby construction in Emerald Highlands of homes less than half the size of the Plaintiffs' homes. The Developer was well aware of the duties of the Architectural Review Board, but the Yeagers simply reviewed proposed construction plans, and they never confirmed compliance with the minimum square footage [6] specified in the Architectural Standards or that subsequent construction conformed to the plans submitted by the builders. When a home was built that failed to conform to the architectural standards, they took no enforcement action. Further, although the Developer and the Yeagers promoted Emerald Highlands as "upscale" and "exclusive," they defined these terms later to simply mean that the minimum square footage had been met. Moreover, although they admitted that the size and quality of homes within a mile of a home would affect the value of that home, they admitted to approving the nearby construction of homes less than half the size of the Plaintiffs' homes.

The Plaintiffs also filed a motion for partial summary judgment and designated the same evidence summarized above in support of their motion. In addition, the Plaintiffs submitted evidence from an expert quantifying the loss in value of their homes. Specifically, the expert's opinion was that the Cotteys' home was worth $185,000 less, and the McManama's home was worth $195,000 less, than if "surrounded by homes of comparable size and quality." *Id.* at 158. The Plaintiffs argued in support of their motion that during the pre-sale period, the Developer and the Yeagers—charged by the Declaration with sole control of the future development of Murphy's Landing—had a fiduciary duty

---

**5.** No testimony by Morse was included in the designated evidence.

**6.** The minimum for a one-story home is 2,000 square feet; it is 2,400 for a two-story home.

to them, and that Morse was their agent in that regard. They further argued that during the post-sale period, the Developer and the Yeagers also owed them "contractual duties imposed" by the Declaration. (Plaintiffs' App. 161). The Plaintiffs' motion requested the trial court to hold that the Developer and the Yeagers owed duties to them *and* that they had breached those duties and were liable.

On June 3, 2004, the trial court heard arguments on all pending motions for summary judgment. Subsequently, the trial court denied the Yeagers' motion for summary judgment. As to the Plaintiffs' motion for summary judgment, it held that all of the defendants owed the Plaintiffs "a contractual and fiduciary duty"; that "[a]n agency relationship existed between the defendants and Steven Morse"; and that all defendants "had a duty to deal fairly, honestly and openly with plaintiffs." (Order of June 14, 2004). However, the trial court did not make a determination as to any breach of duty or liability by the defendants.

Trial of the matter began on September 26, 2005, and the court heard highly contested evidence from both sides over three days.[7] The testimony of the Plaintiffs was consistent with the designated evidence. Mrs. Cottey testified that her initial discussions with Morse and his reference to architectural standards pre-dated the construction of any homes in Emerald Highlands and the filing of the Declaration; Morse did not advise her of the filing of the Declaration; and before closing on the lot and entering into a contract to build their home, Mrs. Cottey had shown Morse preliminary plans for a home of more than

5500 square feet. When entering into their contract for a lot and the building of their $491,000 home in December of 1995, Mrs. Cottey relied on Morse's representation that a $400,000 model home shown to her that he had built in Emerald Highlands was representative of the size and quality of homes that would be built there. She further relied on his representation that there would be an architectural review board to enforce high standards.

Mr. McManama testified that in June of 1997, he met with Morse. Morse showed him several homes, including the model home he had built and which Morse indicated to be representative of the homes to be built in Emerald Highlands.[8] McManama indicated their intention to build an approximately 5,000 square foot home, and Morse told them that such a home would fit nicely in Emerald Highlands. Morse also gave McManama promotional material,[9] which stated that an architectural review board would maintain high standards in Emerald Highlands—"an exclusive custom home community of 60 homesites to insure consistent quality throughout the neighborhood." (Ex. 19). The lot selected and purchased by the McManamas was the first to be built upon in the second section of Emerald Highlands.

Subsequently, Morse advised McManama to deal with Duran in the future. The McManamas then met with Duran and described to her their intention to build a home of approximately 5,000 square feet and showed her plans "of what the house was going to look like that we wanted to build." (Tr. 255). McManama testified that he then "specifically asked" whether "homes of comparable size and architectur-

---

7. Again, there was no evidence from Morse— who was not called as a witness.

8. Photographs of these homes were admitted into evidence.

9. A copy of the brochure, dated 3/15/95, was admitted into evidence.

al [sic] to ours" would be built around theirs, and "her comment was not to worry; she would take care of it." *Id.* McManama testified that he relied on the representations of Duran and Morse, as well as the brochure from Morse and the homes shown them (including the model home that Morse had built) as representative of homes to be built, when they contracted to purchase their lot and to construct a $470,000 home.

After the construction of the Cotteys' home was nearing completion in late 1997, Mrs. Cottey noticed new homes of a substantially less expensive nature being built in Emerald Highlands. Some were around 2,000 square feet in size and assessed at only $200,000. The McManamas also observed smaller homes being built around them after they had completed their home in July of 1998. Evidence was admitted indicating that 10 of the 59 homes built in Emerald Highlands, with Architectural Review Board approval, did not meet the minimum architectural standards. Further, 17 of the 59 homes had assessed fair market valuation of less than $250,000, a value more than $150,000 less than that of the Cottey home's assessed valuation and $80,000 less than the McManama home's assessed valuation. Of those 17 homes with significantly lesser valuations, 15 were constructed after the Cotteys' lot was purchased, and 13 were constructed after the McManamas' lot was purchased.

At the conclusion of trial, the parties agreed that post-trial briefs and submission of proposed findings and conclusions would follow receipt of a transcript of the trial. On May 26, 2006, the trial court entered its order. The forty-one page order contains 220 findings of fact, which are annotated to the trial transcript for support. The trial court found as a matter of

law that the defendants owed the Plaintiffs "a duty of fair dealing and honesty" and "a duty of good faith and fair dealing," as well as "contractual obligations" pursuant to the Declaration. (Order, p. 35, 36, 37). It concluded that the evidence established "Defendants['] fraud and constructive fraud" and their "failure to meet their contractual and fiduciary duties" to the Plaintiffs. *Id.* at 39. Finally, it concluded that the Plaintiffs had suffered damages as supported by expert testimony.[10] The trial court entered judgment in favor of the Plaintiffs accordingly.

## DECISION

### 1. Denial of Yeagers' Motion for Summary Judgment

When we review the appeal of a decision by the trial court to deny a motion for summary judgment, our standard of review

> is the same as that used in the trial court: summary judgment is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Corr v. American Family Ins.*, 767 N.E.2d 535, 537 (Ind.2002). All doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 909 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.; Corr* at 537–38. If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

The denial of a motion for summary judgment may be pursued on appeal after

---

10. Specifically, the trial court found that the Cotteys had suffered damages in the amount

of $244,474, and that the McManamas had suffered damages in the amount of $202,878.

the entry of final judgment. *Keith v. Mendus*, 661 N.E.2d 26, 35 (Ind.Ct.App. 1996); *see also West American Ins. Co. v. Cates*, 865 N.E.2d 1016, 1020 (Ind.Ct.App. 2007), *trans. denied.* However, the party appealing from the denial of a summary judgment motion has the burden of persuading us that the denial of summary judgment was erroneous. *Owens Corning Fiberglass*, 754 N.E.2d at 908.

■■■ The Yeagers argue that the representations made by Duran and Morse in the Plaintiffs' designated evidence "were statements of future events and not statements of past or existing fact that would support a claim for fraud or constructive fraud." Yeagers' Br. at 7. Therefore, they assert, their motion for summary judgment "should have been granted." *Id.* at 13. We cannot agree.

We acknowledge that generally, fraud may not be based on representations of future conduct. *See Bilimoria Computer Sys. v. America Online*, 829 N.E.2d 150, 155 (Ind.Ct.App.2005). However, representations as to future conduct may, in some situations, give rise to a constructive fraud, *see In re Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 912 (Ind.Ct.App. 1999); *see also Orem v. Ivy Tech State College*, 711 N.E.2d 864, 868–69 n. 5 (Ind. Ct.App.1999), *trans. denied,* and particularly so when a fiduciary relationship or duty is implicated. *See Morfin v. Estate of Martinez*, 831 N.E.2d 791 (Ind.Ct.App. 2005); *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind.Ct.App.1998).

The statements of Duran and Morse in the designated evidence must be considered in light of the following. The Yeagers were the sole owners and members of Yeager Realty, L.L.C., the developer of the Murphy's Landing project. The Yeagers had drafted, executed, and recorded the Declaration. The Declaration charged the HOA with the management of Mur-

phy's Landing, and the Yeagers were the initial Board of Directors of the HOA. The Declaration further provided that the Yeagers were the sole members of the Architectural Review Board, which entity was charged with preserving and enhancing the values of real estate in Emerald Highlands. The Yeagers delegated to Morse the drafting of architectural standards for Emerald Highlands, and the Yeagers then adopted them. The Yeagers promoted Emerald Highlands as the most exclusive and upscale residential community in Murphy's Landing. Thus, the Yeagers were responsible for enforcing the standards for homes being constructed in Emerald Highlands. In light of these facts, there is a material issue of fact as to whether the designated evidence of Duran's and Morse's representations were sufficient to support the Plaintiffs' claims for fraud or constructive fraud along with their claim for the breach of fiduciary duty.

■ The Yeagers' next issue and corresponding argument are unclear. In the "Statement of Issues" section of their brief, the Yeagers state that the second of their three "Issues on [the trial court's ruling on their] Motion for Summary Judgment" is "[w]hether the Trial Court erred in finding that the doctrine of fraudulent concealment was applicable to the facts and circumstances of this matter." Yeagers' Br. at 1. However, in the corresponding argument section of their brief, the Yeagers assert that the trial court "erred in allowing the [Plaintiffs] to recover under a theory of fraudulent concealment because the doctrine of fraudulent concealment is not applicable to this case." *Id.* at 13. The discrepancy between the two proffered issues—the alleged error as to the summary judgment ruling or as to the judgment after a bench trial—is never explained. Moreover, the Plaintiffs' com-

plaint alleged alternative theories of fraud, constructive fraud, *or* fraudulent concealment. We decline to address an issue that is unclear to us.

■ Finally, the Yeagers argue that the trial court erred in denying their motion for summary judgment "because the alleged statements are opinion as opposed to statements of fact." Yeagers' Br. at 15. They remind us that expressions of opinion cannot be the basis for an action in fraud and do not constitute actionable misrepresentations, citing *Block v. Lake Mortgage Co., Inc.*, 601 N.E.2d 449, 451 (Ind.Ct.App. 1992), and *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir.1986). Again, we note that the Plaintiffs alleged not only fraud but also constructive fraud and breach of the Yeagers' fiduciary and contractual duties. Further, after denying the Yeagers' motion for summary judgment, the trial court still retained the inherent power to reconsider its ruling. *See Stephens v. Irvin*, 734 N.E.2d 1133, 1135 (Ind.Ct.App.2000) ("trial court has the inherent power to reconsider any of its previous rulings so long as the action remains in fieri."). "An order denying a motion for summary judgment is not a final judgment; ... the matter is subject to an ultimate determination by the trier of fact." *Haskell v. Peterson Pontiac GMC Trucks*, 609 N.E.2d 1160, 1163 (Ind.Ct. App.1993). Given the Yeagers' responsibilities as outlined in the Declaration and the architectural standards, we do not find, as argued by the Yeagers, that there is *no* question of fact regarding whether the statements were opinions and that, therefore, they (the Yeagers) were entitled to summary judgment as a matter of law. The evidence designated by the parties pertaining to representations allegedly made by the Yeagers raised issues of disputed and material fact that could only be determined or resolved by trial.

2. *Order on Summary Judgment*

We next consider the arguments by the Yeagers and the Developer asserting that the trial court's order of partial summary judgment was erroneous.

■ The Yeagers first argue that the trial court's finding "that Morse was an agent for" them "in dealing with Cottey and the McManamas" was erroneous because there were "genuine issues of material fact regarding whether [they] exercised appropriate control over Morse in order to create an agency relationship." Yeagers' Br. at 17, 18. The Yeagers concede that the "summary judgment record makes clear" that "potential buyers interested in Emerald Highlands were referred to Morse while Morse was the exclusive builder." *Id.* at 22. However, they argue that the evidence established that Morse negotiated the price for the sale of lots in Emerald Highlands, and that Morse "was exclusively in control of" whatever "representations or statements [Morse made] to potential home buyers"; therefore, they conclude, "Morse did not function as an agent of the Yeagers." *Id.* at 22. We cannot agree.

■ An agent is one who acts on behalf of another, with their consent and subject to their control. *Oil Supply Co. v. Hires Parts Serv.*, 726 N.E.2d 246, 248 (Ind.2000). A principal is bound by acts of its agent taken "within the usual and ordinary scope of the business" in which the agent is employed. *Apple Glen Crossing v. Trademark Retail, Inc.*, 784 N.E.2d 484, 488 (Ind.2003).

The representations *at issue* do not concern the price of the lots or the negotiation thereof. The specific representations made by Morse that form the basis of the Plaintiffs' complaint relate to the quality of the homes that would surround the homes

that the Plaintiffs proposed to build in Emerald Highlands. The quality of homes to be built there in the future is a matter governed by the Declaration, particularly its Architectural Review Board and its architectural standards. The designated evidence showed that the Yeagers made Morse the exclusive builder for homes in Emerald Highlands; the Yeagers delegated to Morse the drafting of the architectural standards for Emerald Highlands and directed that the standards reflect that it was the most exclusive residential area of Murphy's Landing; the Yeagers adopted, executed, and recorded the Declaration, including the architectural standards drafted by Morse and the requirement that the Architectural Review Board control development so as to preserve and enhance values; and the Yeagers authorized Morse (and only Morse) to answer all inquiries about the development of Emerald Highlands. Hence, Morse's representations about the future development of Emerald Highlands were of matters within the Yeagers' sole control—by virtue of the Declaration, the Architectural Review Board, and the architectural standards.

 "Placing an agent in a position to act and make representations which appear reasonable is sufficient to endow him with reasonable authority." *Zimmerman v. McColley,* 826 N.E.2d 71, 79 (Ind.Ct. App.2005). When a party places an agent in the position of sole negotiator on his behalf, it may be reasonable for a third party to believe that the agent possesses authority to act for the principal. *Id.* The actions of the principal have created the "apparent authority" of the agent. *Id.*

Evidence that the Yeagers designated Morse as their exclusive builder, knowing that he was personally familiar with the Declaration and the architectural standards, and that the Yeagers authorized Morse to answer all questions pertaining to the future development of Emerald Highlands, is sufficient evidence to support a finding of Morse's apparent authority. Therefore, the trial court's summary judgment ruling was not erroneous in its finding that Morse was the Yeagers' agent.

 Further, as noted above, "a trial court has the inherent power to reconsider any of its previous rulings so long as the action remains in fieri." *Stephens v. Irvin,* 734 N.E.2d 1133, 1135 (Ind.Ct.App.2000). This statement of law also is apposite as to the Developer's appellate argument challenging the trial court's finding on its order of partial summary judgment that Morse was its agent. The Developer argues that the designated evidence "at best establishes that a genuine material fact existed as to whether Morse had either actual or apparent authority to act on behalf" of the Developer. Developer's Br. at 14. During the trial, both the Yeagers and the Developer were able to fully litigate the issue of Morse's authority and whether he was their agent. If the evidence at trial failed to establish that Morse was the agent of the Developer (or of the Yeagers), the trial court held the power to so hold in its final judgment. *See Haskell,* 609 N.E.2d at 1163 (matter subject to ultimate determination by trier of fact).[11]

 Next, the Yeagers argue that the trial court erred in finding in its order of partial summary judgment that they owed

11. We note that neither the Yeagers nor the Developer argue that the evidence at trial failed to support the trial court's finding in its final order that Morse was their agent, and we discern no appreciable difference between the designated evidence and that admitted at trial in that regard. It is true that the bro-

chure given to the McManamas by Morse was not part of the designated evidence, but its assertions as to Emerald Highlands being upscale and the most exclusive of the Murphy's Landing communities and that Morse was its exclusive builder were facts admitted by Duran in the designated evidence.

the Plaintiffs a fiduciary duty.[12] Specifically, they assert that the Plaintiffs engaged in arms length transactions as to the purchase of their respective lots, and that there was no relationship whatsoever between the Yeagers and Cottey during the events leading up to the construction of her home.

With respect to their first argument, the Yeagers cite *Comfax Corp. v. North American Van Lines, Inc.*, 587 N.E.2d 118, 125–26 (Ind.Ct.App.1992), for the proposition that arms length transactions preclude the existence of a fiduciary relationship to sustain constructive fraud. *Comfax* found that because the parties "were involved in an arm's length, contractual arrangement," the plaintiffs failed to demonstrate "a special relationship between the parties that could form the basis of a constructive fraud claim." However, in *Comfax*, there were no separate contractual obligations of the defendants to the plaintiffs analogous to the Declaration's contractual obligations owed by the Yeagers to the Plaintiffs. Thus, even if the transactions for the purchase of the lots were at arms length, it appears there was a "special relationship" of the Yeagers to the Plaintiffs by virtue of the Declaration that could sustain a claim for constructive fraud. With respect to the Yeagers' second argument—that they had no contact with Mrs. Cottey preceding the construction of her home, the finding that Morse was their agent renders this argument moot.

As the Plaintiffs note, the trial court's order on partial summary judgment simply stated that the Yeagers owed both "a contractual and fiduciary duty" *and* "a fiduciary duty to deal fairly, honestly and openly." (App. 252). The Yeagers' argument does not distinguish between the two separate preliminary rulings as to their "duty." With respect to the first duty, it does not appear that the Yeagers ever argued that they did not owe any contractual duty pursuant to the provisions of the Declaration and their having sole authority with respect to development of Emerald Highlands. Hence, the statement that the duty was both "fiduciary and contractual" may be seen as harmless error, inasmuch as the alternative was effectively conceded. *Id.*

As to the partial summary judgment's ruling that they owed "a fiduciary duty to deal fairly, honestly and openly," *id.*, the Yeagers have not challenged the trial court's ruling that they owed a "duty to deal fairly, honestly and openly." *Id.* We have noted above that "a trial court has the inherent power to reconsider any of its previous rulings so long as the action remains in fieri." *Stephens*, 734 N.E.2d at 1135. The trial court in its final judgment found that the Yeagers owed the Plaintiffs "a duty of fair dealing and honesty," and noted that "the existence of a fiduciary duty" was not necessary for a finding of constructive fraud; it then proceeded to find that the Yeagers had "constructively defrauded Plaintiffs." (Order 35). Hence, any error in the trial court's initial finding that the Yeagers had a fiduciary duty to the Plaintiffs in the context of considering the Plaintiffs' fraud/constructive fraud/fraudulent concealment claim has been rendered harmless.[13]

### 3. Final Judgment

Here, the trial court entered findings of fact and conclusions of law pursuant to

---

12. Although perhaps not dispositive, we note that Duran testified that the Yeagers understood that the Board of Directors and Architectural Review Board had "fiduciary duties to the homeowners." (Tr. 32).

13. Our conclusion in this regard also renders irrelevant the Yeagers' argument that the designated evidence showed "genuine issues of material fact" as to whether there was a fiduciary relationship between them and the Plaintiffs. Yeagers' Br. at 24.

Indiana Trial Rule 52(A). Therefore, we may affirm the judgment on any legal theory supported by the findings. *Koressel v. Forster,* 838 N.E.2d 1037, 1045 (Ind. Ct.App.2005). We review the judgment by first determining whether the evidence supports the findings and, second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. We will not reweigh the evidence or assess witness credibility. *Id.* Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Id.*

The Developer argues that the trial court "committed error in its findings of fact and conclusions of law" by finding for the Plaintiffs "on the theories of fraud, fraudulent concealment, constructive fraud, and breaches [of] contractual and fiduciary duty." Developer's Br. at 26, 26–27. However, as the Plaintiffs note, the Developer does not argue that any of the 220 specific and detailed findings of the trial court are not supported by the evidence presented. Therefore, we turn to the question of whether the findings support the conclusions of law.

 We consider the Plaintiffs' claim of constructive fraud. Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Paramo v. Edwards,* 563 N.E.2d 595, 598 (Ind.1990). Construc-

tive fraud is inferred by law "from the relationship of the parties and the circumstances which surround them." *Sanders v. Townsend,* 582 N.E.2d 355, 358 (Ind.1991). The elements of constructive fraud are as follows:

> (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind.1996).

The trial court made a substantial number of findings of fact that bear upon the theory of constructive fraud. Specifically, its findings reflect representations of Morse from the time of Mrs. Cottey's initial discussion with him; Morse's position as the exclusive builder for Emerald Highlands as well as his role as drafter of the architectural standards, his knowledge of the Cottey construction plans; the existence of the Declaration and its filing; representations of Morse to the McManamas with his knowledge of the size and quality of the home they proposed to build; Morse's representations to both Mrs. Cottey and the McManamas of existence of the Architectural Review Board and its purpose; Duran's representations and answers to the McManamas about Emerald Highlands construction, although she knew that neither Mrs. Cottey nor the McManamas were advised of the specifics of the Declaration or the architectural standards by Morse or Duran; and at the time of Morse and Duran's representations, they were aware of the actual size and quality of homes that had been built in Emerald Highlands.

The trial court then made the following conclusions of law: the Developer and the Yeagers "owed a duty of fair dealing and honesty" to the Plaintiffs; the "existence of a fiduciary duty" is not necessary to establish constructive fraud; and constructive fraud may arise where the relationship between the parties is that of buyer and seller when the seller makes unqualified statements in order to induce another to make a purchase, the buyer relies on those statements, and the seller has professed knowledge of the truth of the statements (citing *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind.Ct.App.1994) and its citation of *Scott v. Bodor, Inc.*, 571 N.E.2d 313 (Ind. Ct.App.1991)). The trial court then concluded that the Developer and the Yeagers "made unqualified statements to Plaintiffs in order to induce them to purchase their respective lots and build their respective homes," and thereby "constructively defrauded Plaintiffs." (Order 35).

The Developer does not dispute that it owed a duty to deal fairly and honestly with the Plaintiffs regarding their potential purchase of lots in Emerald Highlands. As to whether there was a violation of that duty, the findings by the trial court contain a multitude of unqualified statements made by Morse and Duran—with knowledge of the approximate size and quality of homes that the Plaintiffs intended to build—representing that the surrounding homes in Emerald Highlands would be of a comparable size and quality. Morse and Duran failed to qualify their statements—*i.e.*, they remained silent when a duty to speak exists, *Rice*, 670 N.E.2d at 1284—by advising the Plaintiffs of the actual minimum requirements of the architectural standards, *or* that the Declaration gave the Architectural Review Board the sole authority to approve plans for home construction, *or* that the architectural standards could be changed at will

by the Developer. Further, as discussed earlier, there existed a special relationship between the parties by virtue of the Declaration, by which the Developer had delegated to its members, the Yeagers, sole authority for management and development of Emerald Highlands and the obligation to preserve and enhance the values of its property owners. Finally, Mrs. Cottey and Mr. McManama both expressly testified that they relied on the representations by Morse and Duran as to the surrounding quality of homes to be built in Emerald Highlands when making the decision to buy a lot and spend a great sum of money constructing a very large home. At trial, Duran conceded that pursuant to the Declaration, homeowners were "entitled to rely on" the Yeagers' "performing [their] duties and obligation as a member of the Architectural Review board and the Board of Directors." (Tr. 32). The evidence established that the homes built at great expense by Cottey and the McManamas had a lesser value than they would have had if located amongst homes of comparable size and quality. Finally, the evidence establishes that the Developer gained the advantages of having less lots to sell and supports the inference that the Plaintiffs' large high-value homes in Emerald Highlands served to enhance the Developer's marketing of the remainder of the community as they completed its development.

The trial court's conclusion that the Developer and the Yeagers constructively defrauded the Plaintiffs is supported by findings and the reasonable inferences therefrom. *See Koressel*, 838 N.E.2d at 1045. Further, having determined that the trial court's final judgment can be sustained on this basis, we need not address the Developer's argument that its judgment as to claims of actual fraud, fraudulent concealment, or the breaches of contractual and fiduciary duty was erroneous.

However, the Developer makes one final argument: whether the trial court erred in its judgment when it found that *the Developer,* as an LLC, failed to meet its contractual and fiduciary duties as stated in the Declaration. The Developer reminds us that pursuant to the Declaration, the Yeagers—as directors—are shielded from liability "except for their own individual willful misconduct, bad faith or gross negligence." (Declaration, p. 14). The Developer then argues that the evidence does not support the trial court's conclusion that the failure of the Yeagers to meet their obligations under the Declaration was "wholesale and willful, constituting bad faith and gross negligence." (Order at 38). Therefore, the Developer concludes, the judgment of liability against it cannot stand. We disagree.

The Developer's arguments are rhetorical, and they do not challenge the trial court's findings. The evidence supporting the findings in this regard is virtually undisputed. The Yeagers failed to comply with the Declaration's requirement of conducting HOA meetings or of holding meetings as an Architectural Review Board ("ARB"). Although the Declaration provided that the three Yeagers solely constituted the ARB, one of them *never* participated in any decisions of the ARB. Generally, only a single Yeager acted as the ARB in approving proposed plans by builders. Except for approving screened porches, the ARB did not act to monitor or grant prior approval for alterations or improvements as required by the Declaration. The Yeagers were well aware that they had the authority to decline the approval of proposed homes that simply met the minimum square footage. However, the ARB merely reviewed plans solely for the purpose of meeting the minimum architectural standards, and never made independent efforts to verify the information initially submitted in builders' proposed plans or compliance with those proposed plans during construction. They did not consider external design and home appearances in approving proposed plans; such matters "were left to the builders' discretion." (Order 19). Further, despite knowledge of violations of the architectural standards, the ARB took no action to force compliance. Lastly, the ARB "made no effort to examine external design, appearance, use and location of the proposed plans to determine whether the proposed home would preserve and enhance values, as contemplated by the [Declaration]." *Id.*

Nevertheless, the Developer argues that the evidence simply does not show the Yeagers "acted willfully[,] intentionally[,] with bad faith or gross negligence." Developer's Br. at 26. Their argument is simply a request that we reweigh the evidence, which we do not do. *See Koressel,* 838 N.E.2d at 1045. The trial court's findings lead to the conclusion that the Yeagers' disregard for the duties established in the Declaration—of which the Developer was the Declarant—was indeed "wholesale." (Order, p. 38). Moreover, the evidence in support of the findings established that not only did the Yeagers fail to comply with the various duties imposed by the Declaration but that they did so with full knowledge of the duties imposed by the Declaration. The trial court's conclusion that the Developer is liable based upon the gross negligence of the Yeagers in failing to fulfill their duties to the Plaintiffs pursuant to the Declaration is not clearly erroneous.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.